[S. F. Nos. 2349, 2350. In Bank.—July 11, 1903.]

## CITY OF MONTEREY, Appellant, v. DAVID JACKS, Respondent.

PUEBLO LANDS—POWER OF LEGISLATURE—DEED OF MUNICIPALITY.— Pueblo lands, unlike lands acquired by a municipality in private ownership, were not the subject of an indefeasible proprietary interest in the pueblo, or in a city as its successor. They were held by the pueblo as ancillary to a public trust and subject to the supreme dominion of the former Mexican government, and upon

the change of government became subject to the control of the legislature of the state, which had power, under the constitution of 1849, to authorize or ratify a deed of the whole of the pueblo lands by the municipality.

ID.—RATIFICATION OF DEED—DEFECTS OF FORM—OMISSION OF SEAL OF CITY.—An act of the legislature ratifying and confirming a deed of pueblo lands operates not only to ratify an unauthorized sale made thereunder, but also to cure all defects of form in the manner of its execution, including the omission of the seal of the city from a deed executed by its trustees.

ID.—DEED BY TRUSTEES OF CITY—AUTHORITY OF TRUSTEES—EVIDENCE —OFFICER DE FACTO—COMMON REPUTE—PRESUMPTION.—Where a deed to pueblo lands purported to be executed by the trustees of the municipality to which they pertained, and was acknowledged by them as such, evidence is admissible to show that they were the acting trustees of the city, that they were known to be such from common repute, and to show the proceedings under which the sale and conveyance were made by them; and such evidence is sufficient to show that they were officers *de facto,* who must be presumed to have been legally selected until the contrary is shown.

APPEALS from judgments of the Superior Court of Monterey County and from orders denying a new trial. N. A. Dorn, Judge.

The facts are stated in the opinion of the court.

Pringle & Pringle, and Mastick, Van Fleet & Mastick, for Appellant.

The city of Monterey had no power to convey the whole of its pueblo lands, and the deed is void on its face. (*Hart* v. *Burnett,* 15 Cal. 530; *Branham* v. *White,* 24 Cal. 585; *Redding* v. *White,* 27 Cal. 782; *Board of Education* v. *Martin,* 92 Cal. 217; *Ames* v. *San Diego,* 101 Cal. 360.) The legislature had no power to validate the void deed without the consent of the city. (*Hasbrouck* v. *Milwaukee,* 13 Wis. 37;[1] *Hoagland* v. *Sacramento,* 52 Cal. 142, 150; *San Francisco* v. *Itsell,* 80 Cal. 57; *Conlin* v. *Supervisors,* 114 Cal. 404;[2] *Illinois Central R. R. Co.* v. *Illinois,* 146 U. S. 387.) The legislative control over lands held in public trust does not extend to a diversion thereof from the uses and objects for which they were given or acquired. (*Wooster* v. *Plymouth,* 62 N. H. 193, 209; *Trustees* v. *Tatman,* 13 Ill. 27, 30; *Mt. Hope Cemetery* v.

[1] 80 Am. Dec. 718, and note.    [2] 54 Am. St. Rep. 357.

*Boston,* 158 Mass. 509;[1] *Milam County* v. *Bateman,* 54 Tex. 153, 165; *Trustees* v. *Bradbury,* 11 Me. 118;[2] *Poultney* v. *Wells,* 1 Aiken, 186; *Pearson* v. *State,* 56 Ark. 148, 153.[3]) There was no sufficient proof of execution of the deed by an elected board of trustees, either by primary or secondary evidence, and no sufficient proof that the trustees were *de facto* officers. (*Wilcox* v. *Smith,* 5 Wend. 231, 234;[4] *Cary* v. *State,* 76 Ala. 78, 85; *Hamlin* v. *Kassafer,* 15 Or. 456, 459;[5] *Williams* v. *Boynton,* 147 N. Y. 426, 432; *State* v. *Taylor,* 108 N. C. 196, 200;[6] *State* v. *Wilson,* 7 N. H. 543, 546; *Goulding* v. *Clark,* 34 N. H. 148, 154; *Hall* v. *Manchester,* 39 N. H. 295, 300; *State* v. *Curtis,* 9 Nev. 325, 340.)

John Flournoy, for Respondent.

The evidence that the board of trustees were *de facto* officers was admissible and sufficient to establish that fact and to raise a presumption of regular appointment. (Jones on Law of Evidence, secs. 203, 204; *Druse* v. *Wheeler,* 22 Mich. 442; *Fabian & Co.* v. *Callahan,* 56 Cal. 162; Code Civ. Proc., sec. 1963, subd. 14; *Nalle* v. *City of Austin,* 23 Tex. Civ. App. 595.) The recitals in the deed and the certificate of acknowledgment show *prima facie* that the parties signing it were trustees. (Code Civ. Proc., sec. 1951; *Middleton Savings Bank* v. *Dubuque,* 19 Iowa, 474; *Gordon* v. *City of San Diego,* 101 Cal. 522.[7]) The legislature had the power to confirm the deed, and cure its defects. (*Hart* v. *Burnett,* 15 Cal. 530; *Payne* v. *Treadwell,* 16 Cal. 234; *San Francisco* v. *Canavan,* 42 Cal. 541; *Thompson* v. *Thompson,* 52 Cal. 156; *Gordon* v. *City of San Diego,* 101 Cal. 522.[7])

LORIGAN, J.—Actions to quiet title.

Monterey at the date of the cession of California to the United States was a Mexican pueblo, and, by special concession from the Spanish crown, was entitled to more than the four square leagues of land generally allotted to pueblos. The city of Monterey was incorporated by an act of the legislature of this state, of date March 30, 1850, (Stats. 1850, p.

---

[1] 35 Am. St. Rep. 515, and note.
[2] 26 Am. Dec. 515.
[3] 35 Am. St. Rep. 91.
[4] 21 Am. Dec. 213.

[5] 3 Am. St. Rep. 176.
[6] 23 Am. St. Rep. 51.
[7] 40 Am. St. Rep. 73.

131,) and thereunder succeeded to all the legal rights and claims of the former pueblo to its pueblo lands. On March 2, 1853, said city, by its attorney, D. R. Ashley, duly retained for that purpose by the city, presented to the United States board of land commissioners its petition praying for a confirmation of the pueblo grant to the pueblo of Monterey, and a decree was made accordingly on January 22, 1856, confirming its title. An appeal was taken from this decree by the United States, which appeal was on June 16, 1858, dismissed, with leave to the city to proceed upon the commissioners' decree as a final decree of confirmation. In 1857 the original act incorporating the city of Monterey was amended, and by section 7 thereof it was provided as follows: "The trustees may also pay for the expenses of prosecuting the title of the city before the United States land commissioners and before the United States courts, and for that purpose may sell and transfer any property, right, or franchise, upon such terms and for such price as may by them be deemed reasonable." (Stats. 1857, p. 55.) On January 24, 1859, said Ashley presented to the trustees of the city of Monterey a claim amounting to $991.50 for services as its attorney in presenting such pueblo claim to the commissioners. The claim was approved and allowed, and, there being no funds in the treasury to pay it, the board of trustees passed a resolution directing that a sale of all the pueblo lands of the city, or so much of them as might be necessary to pay the claim of said Ashley, be made at public auction on the ninth day of February, 1859. Due notice of the time for holding said sale was given, and the same was held at the time and in accordance with the notice, at which sale the entire pueblo tract was bid in by the said D. R. Ashley and the defendant, David Jacks, for the sum of $1,002.50, being the amount of the indebtedness and the necessary expenses of sale; no one offering to purchase less than the whole, or bid a higher amount. Thereafter said trustees made, executed, and delivered a conveyance of said lands, dated February 9, 1859, but acknowledged February 12, 1859, in favor of said D. R. Ashley and the defendant, David Jacks, and in the conveyance the proceedings taken by the trustees in the matter of such sale were recited. This conveyance was recorded in the county recorder's office of the

CXXXIX. Cal.—35

county of Monterey, on June 11, 1859. On April 2, 1866, the act to incorporate the city of Monterey was amended to read as follows: "Sec. 2. All sales and conveyances made by the corporate authorities of said city since the eighth day of February, 1859, and which conveyances purport to have been recorded in the county recorder's office of Monterey County, purporting to convey public lands, or lands confirmed to said city of Monterey, in pursuance of the act of Congress of March 3, 1851, (9 U. S. Stats. 631,) and entitled An act to ascertain and settle the private land claims in the state of California, are hereby ratified and confirmed." (Stats. 1865-1866, p. 835.) On September 4, 1869, Ashley conveyed all his interest in the land in controversy to the defendant.

During the trial below it was proven by production of the records of deeds from the office of the county recorder of Monterey County that between February 7, 1859, a few days prior to the execution of the deed in question, and the second day of April, 1866, the date of the passage of the act, there was no record of any other conveyance by the corporate authorities of said city, purporting to convey any of the pueblo lands of the city of Monterey, other than the conveyance to said Ashley and Jacks.

The patent of the United States to the city of Monterey was issued November 19, 1891, and includes the land in controversy, to quiet its title to which the plaintiff shortly afterwards brought these suits. There are two cases submitted upon this appeal, and they will be both disposed of in this opinion. They are precisely similar; the parties are identical; each is an action to quiet title; both depend upon the same facts and present the same propositions of law, and differ only as to the amount of land involved in each. Judgment in both cases went for the defendant in the court below, and on this appeal it is contended on behalf of the appellant,—1. That the trustees of the city of Monterey had no power under the charter to sell or convey the entire pueblo lands, or any considerable portion thereof, as a whole, and that the sale to Ashley and defendant, Jacks, was therefore void; 2. That the persons purporting to act as trustees of the city of Monterey, and who executed the deed to Ashley and defendant, were never trustees of the city; 3. That the act of April 2,

1866, did not ratify or purport to ratify the sale or deed in question; and 4. That the legislature had no power to ratify or validate that transaction. Errors are also assigned to rulings of the court on the admission of evidence.

The principal point in this case is relative to the power and control of the legislature over the lands of the pueblos to which municipalities created by the legislature succeeded.

There is no doubt but that by the statute of 1857, amending the charter of the city of Monterey, that municipality was authorized to make *some* sale or transfer of its property for the very purpose for which it appears the conveyance in question was made, because it is recited in the amended charter that for such purpose the trustees may sell and transfer *any* property, right, or franchise, upon such terms as may by them be deemed reasonable. That this sale was attempted to be made, and all the proceedings were regularly taken under that provision of the charter, is unquestionable, and certainly they were empowered to make a sale of at least *some portion* of the lands. If they had done this, there could hardly arise any question as to the validity of such a transaction.

It is insisted by the attorney for the respondent that this sale under such charter provision was valid, independent of any confirmatory act of the legislature. As this, however, involves the power of the legislature to authorize such a sale, which appellant denies, the whole subject will have to be examined, both as to the original and confirmatory power of the legislature over pueblo lands, and we simply here refer to the statute to show that thereunder a power of sale, to some extent at least, was given, and that the confirmatory act of 1866, if effectual at all, was undoubtedly intended to validate the attempted exercise of that power, if irregularly or improperly exercised in making the deed in question, and to the extent that it purported to be made. It may be conceded, as insisted by appellant, that the lands granted to a Mexican pueblo were in trust for the benefit of its inhabitants, and that after the incorporation of the pueblo into a city by the legislature, these trusts remained the same in their general nature, and that the municipal authorities had no power to alienate these lands in gross, but the question in the case is not what power the pueblo or the city of itself had over the

pueblo lands, but what power or control the legislature had over them, and what authority it could confer upon the city with reference to their disposition, and to what extent it could ratify an attempted but unauthorized sale thereof. Because if the legislature in the first instance could have empowered the city in general terms to dispose of all its pueblo lands, it certainly had the authority, if an unauthorized disposition was made of them by the municipality, to confirm such a conveyance. It is a familiar principle of law that if authority could be originally conferred, its unauthorized exercise may be subsequently ratified. Ratification, by its very terms, assumes power to grant original authority, and, if the power exists, the ratification can be as broad and extensive as the original authority might have been extended or conferred.

It is to be borne in mind while discussing these cases that the transactions here involved occurred almost half a century ago, and that the control of the legislature over pueblo lands is to be measured by the terms of the constitution of 1849, under which it was exercised.

To what extent that control existed in the legislature was a matter which in the early history of this state came before this court for determination in several cases, the earliest of which is almost contemporaneous with the transactions here involved, and the general principle there announced relative to the control of the legislature over pueblo lands has ever since been adhered to. This is the case of *Hart* v. *Burnett*, 15 Cal. 530. The court there learnedly and exhaustively discussed the origin of pueblos, their right and title to pueblo lands, the nature and extent of the trusts under which they were held, and the power and control of the legislature over them upon the establishment of our state government. Upon this latter subject the court (and we state the general conclusions without lengthy excerpts from that case) says: "These municipal lands to which the city of San Francisco succeeded were held in trust for the public uses of that city. This property and these trusts were public and municipal in their nature, and were within the control and supervision of the state sovereignty. The act of the legislature of March, 1858, (Stats. 1858, p. 52,) confirming the so-called Van Ness Ordinance, was a legal and proper exercise of this sovereign

power; and this act gave full effect to the provision of that ordinance, and vests in the possessors therein described, as against said city and state, a title to the lands in said ordinance mentioned." The same doctrine was subsequently affirmed in *Payne* v. *Treadwell,* 16 Cal. 233, which also involved the validity of the confirmatory act of the legislature operating on the Van Ness Ordinance, and the court says: "Conceding for the argument, then, that these alcalde grants were not valid because not authorized, we cannot say, if either by the act of Congress or otherwise the city of San Francisco had title to these lands, that the legislature had not authority for the reasons given in *Hart* v. *Burnett,* 15 Cal. 530, to validate the grants made in her name or the name of her predecessor. Possessing the general political dominion, and this property belonging to a political corporation deriving all of its powers from the political authority, the legislature is competent to validate an act already done for the disposition of this property, as well as to authorize it beforehand. This we understand to be the effect of the authorities cited in *Hart* v. *Burnett,* 15 Cal. 530, in the original opinion and that on the petition for rehearing. . . . The agents of the corporation can sell or dispose of this property of the corporation only in the way and according to the order of the legislature, and therefore the legislature may by law operating immediately upon the subject dispose of this property, or give effect to any previous disposition or attempted disposition of it. The property itself is a trust, and the legislature is the prime and original controlling power managing and directing the use, disposition, and direction of it. Otherwise, the solecism would appear of a derivative power higher in degree and different in kind from the source of its derivation."

To the same effect it is said in *San Francisco* v. *Canavan,* 42 Cal. 552: "In discussing the second ground on which the act is alleged to be unconstitutional, it becomes material to inquire into the tenure by which the title to this land was acquired and is now held by the city and county. . . . The nature of the title has been so often discussed and repeatedly adjudicated by this court that it would now be a work of supererogation to undertake anew a critical analysis of it. It will be sufficient to state generally that it has been established

by those decisions too firmly to be shaken or overthrown at this late day, that neither the former pueblo, nor the city and county, as its successor, ever held an indefeasible proprietary interest in these lands. On the contrary, they were and are held only in trust for certain municipal purposes. Under the Mexican system, while the pueblo might dispose of the lands, or use them in pursuance of the trust on which they were held, they were nevertheless subject to the disposition of the governor without the consent of the municipal authorities. On the change of government, what had before been known as the pueblo of Yerba Buena was incorporated as the city of San Francisco, and afterwards as the city and county of San Francisco. . . . Whilst the Mexican government exercised dominion over this territory, it had the power to direct how the trust should be executed by the pueblo, and to enlarge or limit its powers in respect to the disposition of these lands; and when California was erected into a state of the American Union, it succeeded to the power which the government of Mexico had before exercised over its municipalities. . . . These authorities conclusively establish that the tenure by which these lands are held is wholly different from that by which lands acquired by a municipality by gift or purchase are ordinarily held; and whatever may be the extent of the legislative power over the latter class of lands, there can be no doubt, I think, that in respect to pueblo lands it is competent for the legislature to control and direct how they shall be managed and controlled or disposed of by the municipal corporation.''

These cases at an early date so effectually disposed of this point that little further presentation of it has since been deemed necessary, and while the court in these cases was discussing the matter of pueblo lands as contained in the pueblo of Yerba Buena, to whose rights the city of San Francisco succeeded, still the same rule would apply to all pueblos established in California under the Spanish or Mexican law and incorporated into California municipalities, as they were all laid out on the same general plan and vested with the same general powers concerning their lands. Upon this subject counsel for appellant has cited us to no case in this state holding a contrary view. He contends that some of the language

in *Hart* v. *Burnett.* 15 Cal. 530, sustains his position, but the language to which he calls attention was used by the court in discussing the *status* of pueblo lands under the Mexican law solely, after doing which the court then discussed its *status* under the law of this state, and it is the conclusion of the court on this latter point to which our quotation from the case is directed. Neither has the other case cited (*Redding* v. *White,* 27 Cal. 282) any bearing upon the subject. It determines solely the question of the power of the pueblo under the Mexican law to deal with its lands. The grant there involved was one made by the alcalde under the Mexican law. The point of legislative control over pueblo lands was not, and could not be, there involved.

Some cases from foreign jurisdictions have been cited, but these necessarily have no special application, as they did not involve pueblo lands. The general principle which they decide is, that where land is acquired by a municipality through purchase or devise, or is specially granted to it by the state, the municipality stands in relation to the land so acquired the same as a private individual, and that it is beyond the power of the state to control its disposition, without the consent of the municipality.

There is a marked difference, however, between lands which are held by a municipality in trust for public municipal purposes, such as pueblo lands, and lands acquired by a municipality through purchase or special grant, and held in proprietary right.

And if this distinction is kept in mind, it obviates all difficulty in determining when the legislature has absolute control and when it has no control.

In the one case, the lands being simply ancillary to the execution of the public trust,—lands in which the pueblo never had an indefeasible proprietary interest,—and which were subject to the supreme political dominion of the former Mexican government, became equally subject to the sovereignty of the state of California, through its legislature, upon the change of government. In the other case, when the legislature has conferred on a municipality the right to acquire and hold property, such property when so acquired is invested with the same security as other private rights of prop-

erty, and, unless with the consent of the municipality, its disposition, so as to deprive the municipality of it, cannot be interfered with by the legislature to any greater extent than can the property of individuals. This distinction was clearly pointed out in *Grogan* v. *San Francisco*, 18 Cal. 615. This case appellant confidently cites as supporting his position here. It not only does not do so, but clearly points out the marked difference between the control the legislature has over land held in trust by the city for general municipal purposes, such as pueblo land, and its control over land acquired by the city for municipal uses by special grant or purchase, and held in proprietary right.

This last case was in relation to the "City Slip Property," which the legislature had granted to San Francisco under what is known as the "Beach and Water Lot Act."

It was a special grant by the state to the city of San Francisco of land which was not embraced within the original pueblo lands, and which belonged to the state.

After the grant the legislature undertook to control the disposition of it without the consent of the city, and its power to do so was denied by this court. It was held, in harmony with the general rule above stated, that this land, having been acquired by special grant from the state, was held under the same right by the city as the property of an individual is held, and not subject to legislative control without municipal consent.

And in order that there might be no doubt as to the difference in the rule governing the power of the legislature over the two classes of property, and so that the rule in *Grogan* v. *San Francisco*, 18 Cal. 615, might not subsequently be cited as militating with the rule declared in *Hart* v. *Burnett*, 15 Cal. 530, and *Payne* v. *Treadwell*, 16 Cal. 233, the court, in the Grogan case, expressly points out that difference, and concludes its opinion in the following language: "The cases of *Hart* v. *Burnett*, 15 Cal. 530, and *Payne* v. *Treadwell*, 16 Cal. 222, cited by the counsel of the appellant, do not conflict with the views we have expressed as to the authority of the legislature over the property of a municipal corporation. They both treat of lands held by the city of San Francisco as successor of the former pueblo, and of the power of the

legislature to validate a grant of such lands previously made by the act of the city. Those lands were held by the pueblo, and the city as its successor, in trust for public municipal purposes, and the trust was subject to the direction, supervision, and control of the government. The cases cited have no application to a case like the present, where the legislature has undertaken to divest property which is not held upon any such trusts, without the city's previous consent or the city's subsequent acceptance of its act." (*Grogan* v. *San Francisco*, 18 Cal. 615.)

We are satisfied from the above authorities that while under the Mexican law the officers of a pueblo were empowered to make grants of the pueblo lands, yet the pueblos had no indefeasible proprietary interest in them; that they were held in trust for public and municipal purposes, subject to the control and disposition of the Mexican government; that upon the establishment of our state government it succeeded to the same sovereignty over them as was exercised by the former government, and that their control and disposition came fully, entirely, and absolutely within the power of the legislature as representing such sovereignty.

And as the full and complete control of said lands was a matter within the power of the legislature, it could have originally conferred upon the trustees of the city of Monterey (if under the act it did not) the right to dispose of them. We think also that there is no doubt that the legislature had the power to confirm the deed in question, and that the act in question here operated to effect that purpose.

As before stated, it is a principle of law that where authority exists to empower an act to be originally done, and the power is attempted to be exercised by an agent without authority, or contrary to a mode provided for its exercise, such attempted exercise of power may be ratified by the principal, and when so ratified operates as effectually as if the authority were originally conferred and properly exercised, and this rule applies as well to municipalities as to individuals.

Under the old constitution, which made it possible for the legislature to indulge in this species of legislation, it was not uncommon in amending the charters of cities to insert therein provisions similar to the one under consideration, and this

court has had occasion to deal with this precise question growing out of such legislation, in the case of *Thompson* v. *Thompson,* 52 Cal. 157. There a deed of the pueblo lands signed by the president and trustees of Santa Barbara was assailed on the ground that it had not been shown that the trustees had any power to make the grant, and the question was there, as here, as to the effect of a confirmatory provision in the amended charter of that city. The court said: "If there was any infirmity in the deed from the town authorities to Espinosa, for want of authority or legal capacity to make it, the defect was cured by the third section of the act of February 4, 1872, (Stats. 1871-1872, p. 78,) which enacts that 'all acts and proceedings of the board of trustees of the said town since the first day of January, 1870, are hereby approved and confirmed.' This deed was made after that date and before the passage of the act, and as the land in controversy was a part of the pueblo lands confirmed and patented to the town of Santa Barbara, it was for the legislature to direct in what manner they should be disposed of. A subsequent approval by the legislature of a prior disposition of the land by the town authorities was equivalent in law to a previous authority so to dispose of them." To the same effect are *Hart* v. *Burnett,* 15 Cal. 530, and *Payne* v. *Treadwell,* 16 Cal. 221, to which we have heretofore referred. In fact, those cases, while discussing the general power of the legislature over the control and disposition of pueblo lands, were dealing specially with confirmatory acts of the legislature concerning them. In this same line are the cases, *San Francisco* v. *Beideman,* 17 Cal. 462; *Gordon* v. *City of San Diego,* 101 Cal. 522,[1] and *Oakland* v. *Oakland Water Front Co.,* 118 Cal. 194.

- It would hardly be necessary to discuss these two propositions separately if it were not for an additional objection urged by appellant against the power of the legislature to either originally authorize, or subsequently confirm, a sale of pueblo lands to the extent that was attempted by the trustees in this instance, because the power to confirm implies the power to authorize, and when one is proven the other exists as a necessary legal consequence. This objection is, that the only power and control that the legislature had over

[1] 40 Am. St. Rep. 73.

the pueblo lands was limited in extent, and that it could only authorize their sale or disposition in limited quantities; that it could not authorize, hence could not confirm, a sale of them in an entirety. Our attention has not been called to any such limitation in the constitution, and our examination discloses none. No such restriction is referred to in any of the authorities cited or examined, and such a limitation could hardly exist.

Pueblos under the Mexican law were simply part of the political government of the country, and as political agencies the state succeeded to control over them upon the change of government. Whatever property they had, incidental to their existence as pueblos, was held as a municipal trust for the public use of the pueblo. As such agencies, the state was under no obligation to continue their existence. In the exercise of her sovereign power she could have abolished them altogether, or have incorporated them into her own scheme of government as municipalities, with such powers and restrictions as she might see fit to impose upon them. When incorporated by the legislature as municipalities under our government, the new municipalities did not by the simple fact of incorporation succeed to the rights and claims of their pueblo predecessors to the pueblo lands. The former pueblo trust, and the ownership of lands incident to it, had passed with the change of flags, and vested in the state of California as succeeding sovereign. When the pueblo was by the legislature incorporated into a municipality, the act of incorporation was but the expression of the sovereign will that, in the important business of good government, a municipality should take the place of the former pueblo, modeled in such form and invested with such powers as the legislature might determine. If the new municipality acquired control of the lands of the former pueblo (as was usually the case), it did so by express provision in the act of incorporation from the state, not by virtue of any independent claim it could make as successor to the pueblo, because it was only successor by virtue of legislative grant.

So in the case under consideration the city of Monterey acquired control of these lands not as an incident to its creation as successor to the former pueblo of Monterey, but

by express concession in the act of incorporation. It held them in trust for public municipal purposes as a chartered agent of the state, and could only hold them under such conditions and for such time as the state might permit. Its own existence as a municipal corporation depended entirely upon the will of the legislature, and the power which created it could at any time repeal its charter and end its existence. Through such repeal the entire property held for public use—which would include the pueblo lands—would revert to the state, and no limitation being imposed upon the legislature under the constitution of 1849 in that respect, could be then disposed of in any manner it saw fit. And it is difficult to understand why, as the state could acquire this entire property through the repeal of the charter of the city of Monterey, it did not have the power to give effect, by confirmatory legislation, to the act of the city trustees in disposing of it. (*Hart* v. *Burnett,* 15 Cal. 624; *Meriwether* v. *Garrett,* 102 U. S. 511.) Nor does the fact that the operation of the confirmatory act was to convey these lands as an entirety affect the matter. The question is one of power and not quantity. If there was any constitutional limitation upon the extent to which the legislature could exercise its power in the control and disposition of these lands, a different proposition would be presented. But there was not, and in the absence of constitutional limitation we cannot judicially impose it. It was a matter for determination by the people, in creating the organic act, what limitations should be placed on legislative power, and, as far as the matters under consideration here are involved, none were imposed. It is competent for a legislature to exercise all powers not forbidden by the constitution, or delegated to the general government, or prohibited by the constitution of the United States; and when any person challenges an act of the legislature on the ground that it is violative of the constitution, he must point out the particular provision which he claims has been violated. While the appellant has challenged the constitutionality of this confirmatory act, it is nowhere pointed out what particular provision of the constitution has been violated. Nor could the matter of quantity be any limitation on the power of disposition. All municipalities succeeding to the control

of pueblo lands were authorized by the legislature to sell portions thereof, and no one has ever seriously questioned this authority or its exercise. Yet when the last portion of its lands are sold by the municipality, the sum of all the portions sold is equivalent to a disposition of the whole.

It is also contended by appellant that it was not the intention of the legislature by the act of 1866 to confirm this conveyance. It would be beside the question to enter into any particular discussion concerning the rules that are to govern in determining the intent of the legislature, because it is a conceded fact in this case that the only conveyance purporting to have been made at all by the corporate authorities of said city, between the periods mentioned in the act, is the one in question here. It is therefore apparent that the legislative intent must have operated upon this deed, or it could not have operated at all. There is no process of reasoning whereby it could be excluded from its application.

It is further insisted by the appellant that the act of 1866 did not operate to confirm this deed because it only pretends to confirm "all sales and conveyances made by the corporate authorities of said city," etc., and that there is no evidence to show that the three persons who signed the deed were the trustees of the city at the time of its execution. The deed recites that it is executed between the city of Monterey, through the trustees of said city,—to-wit, John Burke Phillips, as president, and Salvador Osio, as treasurer, and John D. Callaghan, as clerk; has affixed to it what purports to be the official seal of the city; contains a résumé of the proceedings taken by the board of trustees and leading up to the execution of the deed; is acknowledged by them in the respective capacities in which they executed it; and is recorded. If the recitals in the deed, the certificate of acknowledgment, and the recordation were not *prima facie* proof that the parties executing it were the trustees (*Middleton* v. *Dubuque*, 19 Iowa, 474; *Gordon* v. *City of San Diego*, 101 Cal. 522;[1] Code Civ. Proc., sec. 1951), we are satisfied it was sufficiently proven by the respondent as a fact. There was evidence upon that point to show that these parties were the acting trustees of the city (two of them were dead and

[1] 40 Am. St. Rep. 73.

the other was mentally and physically incapacitated from appearing or testifying at the trial); that they were known to be such from common report, and there was produced from the archives of the city a record containing the minutes of the board of trustees of the city of Monterey showing the proceedings under which this sale was made, and further showing that these parties for a considerable length of time transacted the city's business. We think this evidence was sufficient to establish that they were *de facto* officers, and, this having been proven, their legal selection will be presumed until the contrary is shown. The presumption is indulged in that a person acting in a public office was regularly appointed to it. (Code Civ. Proc., sec. 1963, subd. 14; *Nalle v. City of Austin*, 23 Tex. Civ. App. 595; *Gordon v. City of San Diego*, 101 Cal. 522.[1]) There was no evidence offered by the appellant to prove the contrary, or even to raise a suspicion that these trustees were not the officials they purported to be. The appellant did introduce in evidence a resolution of the board of trustees of the city, dated June 23, 1865, reciting: "And it appearing that the sale of the city lands to D. Jacks and D. R. Ashley, on February 9, 1859, was unauthorized and illegal," etc. It might readily be inferred from the language used in this resolution that these succeeding trustees would hardly have called the transaction in question here a "sale" of the city lands, if they knew that the parties purporting to be trustees had never been such officials. There is nothing in the resolution which would imply that the parties purporting to make the sale were not the legal officers of the city, but rather that the manner in which they attempted to act was beyond their power and unauthorized.

In addition it is urged that the deed executed by the trustees of the city did not have affixed to it any corporate seal. This, however, if true, could not avail the appellant. It was an infirmity in the conveyance which was cured by the confirmatory act of 1866. An act ratifying and confirming a conveyance operates not only to ratify the unauthorized sale made under it, but to cure all defects in the form and manner of the execution of the conveyance itself. The last point made is, that the court erred in the admission of evidence

[1] 40 Am. St. Rep. 73.

that the persons who signed the deed were commonly reputed to be the trustees of the city of Monterey at that time. We think the evidence was admissible. (Jones on Evidence, sec. 204.)

We see no error in either of the judgments or the orders denying the motions for new trials, and they are all therefore affirmed.

McFarland, J., Henshaw, J., and Angellotti, J., concurred.

Van Dyke, J., and Shaw, J., dissented.

Rehearing denied.

Shaw, J., Van Dyke, J., and Beatty, C. J., dissented from the order denying a rehearing.