[Civ. Nos. 2434 and 2437.  Third Appellate District.—August 23, 1922.]

## COUNTY OF PLACER, a Body Corporate, etc., et al., Plaintiffs and Appellants, v. LAKE TAHOE RAILWAY & TRANSPORTATION COMPANY (a Corporation), et al., Defendants and Appellants.

[1] PUBLIC LANDS—LOCATION OF TOWN SITE—FILING OF DECLARATORY STATEMENT—INCEPTIVE RIGHTS.—While the filing of a declaratory statement under section 2338 of the act of Congress of 1867 (14 Stats. at Large, 541) is not necessary to the location of a town site, it is proper under said act to take that course as the initial step for making a town site entry in preference over the making of a cash entry as the first step looking to the pre-emption of the lands for such a purpose; and, while the scope of a declaratory statement does not extend as far as a cash entry in the preservation of the rights of the settlers, the effect of such filing is, even if not as against the government, certainly as against the claims of others, to vest in those who are actual or *bona fide* settlers upon and occupants of portions of such lands at the time of the filing of such statement an inceptive right to the portions so settled upon and occupied.

[2] PUBLIC COMMONS — QUIETING TITLE—MAPS—PRIMA FACIE CASE — BURDEN OF REBUTTAL.—In this action to quiet title to a block of land as constituting a public commons of a town, the introduction in evidence of a map which was made by and under the authority of the act of the legislature of 1867 and 1868 (Stats. 1867–68, p. 692), and on which said land was designated as a public commons, made out a *prima facie* case in favor of the plaintiffs, and the burden was upon the defendants to overthrow or overcome, by competent evidence, the fixed probative effect imparted by the law to said map and the field-notes made at the same time, which burden was not sustained.

[3] ID.—PLEADING—ESTOPPEL IN PAIS—WAIVER.—Where a party relies upon estoppel *in pais* it is his duty to plead it, and where he has failed to do this the question cannot be considered.

[4] ID.—GRANT OF RIGHT OF WAY TO RAILWAY COMPANY—EVIDENCE.— In this action to quiet title to a block of land as constituting a public commons of a town, the contention of the defendant railway company that its right to occupy the portion of said block over which its tracks cross was granted to it by the board of supervisors of the county was not sustained by the evidence.

[5] ID.—GRANT OF RAILWAY RIGHT OF WAY OVER PUBLIC COMMONS— POWER OF SUPERVISORS.—The board of supervisors of a county have

5.  Right to use park or public square for railroad purposes, note, 21 **Ann. Cas. 689.**

not the power, under section 5 of the act of 1868, to grant a railway company a right of way over a public commons of a town without the consent of the inhabitants of said town. (On petition for hearing in supreme court, approval withheld.)

[6] Fixtures—Intention — Tests. — Generally speaking, the question whether personal property affixed to land becomes a part thereof is largely one of intention, and this intention is to be determined by certain general tests, of which the one most pertinent is the adaptation or application of the personal property to the use or purpose to which that part of the realty to which it is connected is appropriated.

[7] Id. — Erection of Railway Plant — Character of Property. — Where a railway company lays its tracks and erects buildings for the proper conduct of its transportation business over and across land under a claim of right, such property cannot be held to become a part of the realty, but will at all times retain the character of personalty.

[8] Statute of Limitations — Adverse Possession of Public Property.—Where a piece of ground is reserved for or dedicated to public purposes and, therefore, becomes public property, title thereto cannot be acquired as against the public by adverse possession, and the right of action to recover possession of the same for the public purposes to which it has been dedicated is not subject to the statute of limitations.

APPEALS by both plaintiffs and defendants from judgments of the Superior Court of Sacramento County. Fred V. Wood and J. J. Trabucco, Judges Presiding. Affirmed in part; reversed in part.

The facts are stated in the opinion of the court.

J. B. Landis, W. B. Lardner and Meredith, Landis & Chester for Plaintiffs and Appellants.

Raglan Tuttle and H. F. Droste for Defendants and Appellants.

HART, J.—This is a controversy over a block of land, known and designated as block six of the town of Tahoe City, California, and which is alleged and found by the court to be public commons.

It is alleged that the defendants are and have been for many years wrongfully and without right in possession of and occupying certain portions of said block, claiming the

ownership thereof in fee. The prayer of the complaint is that said block of land be adjudged and decreed to be and is and constitutes public commons of said town of Tahoe City, "for the use and benefit and enjoyment of the inhabitants thereof and the public in general"; that the defendants nor any of them have any right, title, interest, or estate therein, and that they and each of them and their agents, etc., be forever restrained and debarred from asserting any right, title, or interest therein or thereto, and that the judge of the superior court in and for the county of Placer be adjudged to be the legal owner of said land and that he holds and owns the same as trustee "and is entitled to exclusive possession thereof in trust for the several use and benefit of the occupants of said Tahoe City Townsite, jointly, and collectively."

The defendants, Railway Company, Tahoe Mercantile Company, and Mercantile Trust Company, etc., answered the complaint, interposing specific denials and certain alleged special defenses. It is alleged by the Trust Company that defendant Railway Company became and was at the time of the commencement of the action indebted to said Trust Company in the sum of $500,000, and that, to secure the payment of said indebtedness, defendant, Railway Company, executed and delivered to defendant, Trust Company, a mortgage, dated October 1, 1901, and duly recorded, covering all the real property described in the complaint and all personal property of said Railway Company; that said indebtedness has not been paid, and that the same has been ever since the date thereof, and now is, a valid and subsisting lien upon said real and personal property, etc. Defendant Railway Company alleges that for more than fifteen years last past said defendant has been actually engaged in the business of transporting passengers for hire for the general public, by means of a steam railroad, between the towns of Truckee, in Nevada County, California, and said Tahoe City; that its line of tracks and its switches cross the said block six and that for many years it has used, and is now using, said tracks and switches in connection with its business as a common carrier; that likewise it has been for many years, and is now, using the buildings (eight in number) and the real property on which they stand (being a part of block six) in connection with

its business of transporting goods and passengers for hire for the general public, and as a common carrier. And by all the defendants it is alleged that the cause of action stated in the complaint is barred by sections 315, 318, and 343 of the Code of Civil Procedure.

Defendant Tahoe Mercantile Company filed a cross-complaint, setting up its ownership of the part of said block six to which it claims title, the same bordering upon the lake and embracing several hundred feet, the shore line being approximately 217 feet and the right angle lines 126 and 150 feet, respectively; alleges that, without right, the plaintiffs claim to own some interest in said land, and asks that it be adjudged that plaintiffs have no interest therein.

The judgment decrees that said block constitutes a public commons of said city, but that the defendant Tahoe Mercantile Company was the owner of an equitable interest in a certain described part of said block; that the defendant Lake Tahoe Railway & Transportation Company (for many years using a part of said block for its tracks, buildings, etc.) has no right, title, interest, or estate of any nature or kind in said block or in any part thereof; that the last-named defendant be, and it is by the decree required "to forthwith remove all tracks, water pipes and buildings erected or used by it and now located in said Public Commons"; that "J. E. Prewett, as Judge of the Superior Court of the State of California, in and for the County of Placer, as said Judge, and as trustee, holds, owns and is entitled to the exclusive possession of said part of said Block Six in trust for the several use and benefit of the occupants of said Tahoe City town site and of the public generally under the provisions of an act of Congress entitled 'An Act for the Relief of the Inhabitants of Cities and Towns upon Public Lands,' approved Mar. 2, 1867 (14 Stat. L. 541)," and in accordance with the provisions of a certain act of the legislature of the state of California, approved March 2, 1867, etc. (Stats. 1867–68, p. 692.) The decree enjoins all the defendants from using or occupying any of said block in any manner or from asserting title thereto or an interest therein, or any part thereof, except that part to which it is adjudged that the defendant Tahoe Mercantile Company has an equitable title.

There are two appeals: 1. By the plaintiffs from that part of the judgment adjudging the Tahoe Mercantile Company is the owner of an equitable interest in and title to a part of said block six, and also from that part which in effect adjudges that the defendant Railway & Transportation Company has the right to remove from said block its tracks, water-pipes, and buildings erected and maintained thereon by said defendant. 2. An appeal by the defendants Railway Company and Mercantile Trust Company of San Francisco from so much of the judgment as adjudges and decrees that said defendant Railway Company has no right, interest, estate, or title in or to the portions of said block occupied and used by said Railway Company.

The land within the boundaries of which block six is embraced is, as seen, situated in Placer County, and borders on the southwestern boundary of Lake Tahoe, being described as the "Southeast quarter of section 6, township 15 N. of R. 17 E., Mt. Diablo Base and Meridian," and for some years prior to and on or about the eleventh day of July, 1868, was "surveyed public domain of the United States." During all the years of 1868 to 1872 a number of persons settled and resided upon and occupied said land, and said land constituted an unincorporated town known as Tahoe City. In the year 1868 the Honorable D. W. Spear, the then county judge of the county of Placer, in pursuance of a request made in the form of a petition by the requisite number of the resident householders of said town, caused the said land to be surveyed and plats, maps, and field-notes made, and proceeded, as the statutes require, to have a patent to said land issued to him as such county judge, and for the purposes in such statutes set forth. The survey of said land was made by one Sam Bethel, a deputy United States surveyor, who made a map of said land and thereon delineated and designated all streets, alleys, public squares, and public commons, etc., as the same existed at the time and which had been theretofore dedicated to a public use, and also the precise boundaries and area of each and every lot or parcel of land claimed by any person. Said map was made in triplicate and certified under oath by Bethel as a "map of Tahoe City," etc. This map was regularly filed for record in the office of the county recorder of Placer County. On said map the land in the block involved in this controversy is marked

and designated as "Public Commons." On the eleventh day of July, 1868, said D. W. Spear, as county judge, proceeding according to the provisions of the federal statute of 1867, filed in the United States land office at Sacramento a declaratory statement of the purpose of the inhabitants of said Tahoe City to enter said land as a town site. The record shows that a contest was pending before the general land office at Washington between the town site of Tahoe City and one Thomas Bittencourt and several other pre-emption claimants, and that the department, after a hearing, not only disallowed and rejected the claims of Bittencourt et als., but also disallowed and rejected said town site application on the ground that it was made to appear in and by said application that said town site did not contain the number of inhabitants in actual occupancy and use of the proposed town site which is required by the said act of Congress of 1867 as the prerequisite to the establishment of any portion of the public domain as a town site. An order was later made, however, granting the town site applicant a further hearing on his application, and on August 2, 1871, the commissioner of the general land office addressed a letter to the register and the receiver of the United States land office at Sacramento, in which it was stated that the Secretary of the Interior, while affirming the conclusion of the commissioner in the Bittencourt pre-emption applications, had "modified the ruling of this office, in this: That the proper authorities can now enter said town site [of Tahoe City] under the act of 1867, notwithstanding the fact that said town site contained less than one hundred inhabitants."

On December 5, 1871, Spear, county judge, as such, in trust for the inhabitants of said town of Tahoe City, made a cash entry (No. 682) of the land as a town site for said town. The register and the receiver of the United States land office at Sacramento were notified of this entry by the general land office on the twenty-fourth day of June, 1872, and that the same was passed for patenting, "in accordance with the entry as authorized by letter of August 2, 1871." On September 10, 1872, a patent from the United States was issued for said town site to said D. W. Spear, county judge, etc., as such judge, in trust for the several use and benefit of the occupants of said town site of Tahoe City,

said patent being certificate No. 682, and based on said cash entry No. 682.

As before intimated, the court found that block six constituted a public commons with the exception of a fractional portion, of which it found that the defendant, Tahoe Mercantile Company, is the equitable owner; that the defendant, Lake Tahoe Railway etc. Company, has no interest of any kind or nature in said block six, or any portion thereof; that the Railway Company was indebted to the defendant Trust Company in the sum of $500,000, as alleged, and that said debt or any portion thereof has never been paid, but that the latter company does not have, and never has had, a valid lien on the real property in block six, claimed by said Railway Company, as security for the payment of said indebtedness or for any purpose.

The rights of the defendant Trust Company, in so far as they are affected by this litigation, are, of course, merged in those of defendant Railway Company, since, manifestly, whether the lien claimed by the former upon the portion of block six claimed by the Railway Company is or is not valid depends entirely upon whether the latter's claim of ownership of said property is or is not valid.

The defendant Mercantile Company bases its claim of ownership of the fractional portion of block six, to which the court decided that it owns the equitable title, upon the alleged occupancy and use of said parcel of said block by one John C. Chesrown.

The defendant Lake Tahoe Railway etc. Company claims its right to the portions of said block occupied and used by it under a purported franchise from the board of supervisors of Placer County, granting it the right to run and maintain its tracks along and across a public highway, known as the "Truckee and Tahoe Turnpike," which, it is claimed, runs over and across block six. All the defendants set up the contention that the plaintiffs are estopped from maintaining this action.

As shown, the declaratory statement and the cash entry of the town site herein involved were filed and made under the Act of Congress of March 2, 1867. (U. S. Rev. Stats., p. 437.) Section 2387 of said act (8 Fed. Stats. Ann., 2d ed., p. 641; U. S. Comp. Stats., sec. 4791), in substance and effect, provides that where any portion of the public

lands, not subject to entry under the agricultural pre-emption laws, have been or may be settled upon and occupied as a town site, the corporate authorities of such town, or, if not incorporated, the judge of the county court of the county in which such town is situated, may enter in the proper land office, and at the minimum price, the land so settled and occupied, and hold the same in trust for the several use and benefit of the occupants thereof, according to their several interests. Said section further provides that, as to the disposal of the lots in such town, and the proceeds of the sales thereof, such trust shall be executed under such regulations as may be established by the legislature of the state or territory in which such town is situated.

Section 2388 of said act (U. S. Comp. Stats., sec. 4792) provides, in part:

"The entry of the land provided for in the preceding section shall be made, *or a declaratory statement of the purpose of the inhabitants to enter it as a town site* shall be filed, with the register of the proper land office prior to the commencement of the public sale of the body of land in which it is included, and the entry or declaratory statement shall include only such land as is actually occupied by the town, and the title to which is in the United States . . ."

The legislature of the state of California, in pursuance of the direction contained in the said act of Congress, at its session of 1867–68 (Stats. 1867–68, p. 692), passed an act regulating the duties of the county judge under said act of Congress. The state statute provides that it shall be the duty of such judge, upon being requested by petition by a stated number of resident householders of such town, to proceed to the taking of the necessary legal steps for the entry of the lands as a town site, to cause a survey of the lands to be made and a plat and map thereof made and filed, and mark by suitable monuments the lands which the inhabitants of such town claim, particularly designating in such survey all streets, roads, lanes, and alleys, public squares, churches, school lots, cemeteries, and commons "as the same exist and have heretofore been dedicated in any manner to public use," etc.

The finding that block six, at the time of the making of the Bethel survey, constituted public commons, is well fortified by the evidence. The dispute here is, as stated, as to the fractional portion of said block claimed by the Mercantile Company and a like portion thereof claimed by the Railway Company. As to these claims, we are of the opinion that there is not sufficient evidence to support either, and that the trial court was, therefore, right in rejecting the Railway Company's claim and wrong in allowing the Mercantile Company's claim. Before passing to a consideration of the evidence, however, a view of the provisions of the federal and state statutes may well first be taken.

The question first discussed in the briefs is as to the legal effect of the filing by the county judge of the declaratory statement on July 11, 1868, the contention of the defendant being that it is merely to withdraw temporarily the town site lands from sale by the government—that is, "pending the submission and hearing of the proofs relative to the requirements of the town site act"—and that it does not, as in the case of a cash entry, create an "inceptive right" to title to the lands involved.

Section 2388 of the act of Congress of 1867, *supra,* explicitly provides two different initiatory steps looking to the patenting for town site purposes government lands subject to such entry—the one by cash entry and the other by the filing of a declaratory statement. While it may be true that the filing of a declaratory statement will not bind the government, it certainly must be true that the effect of such filing is to protect, for a reasonable or limited time, the settlers for whose benefit the filing of such statement is made, against subsequent settlers. If it does not have this effect, then the declaratory statement can accomplish nothing and the insertion in the acts of Congress relative to the acquisition of title to lands of the public domain of the provision authorizing the filing of such a statement was an idle act. But the provision was intended to serve a purpose, as is shown by the decisions of the Department of the Interior and by the decisions of the courts.

In *In re Application of Mather,* 5 Decisions of Land Department, page 633, it is said: "The declaratory statement is a notice given by the settler of his intention to purchase the land and such notice protects his claim against subse-

quent settlers for a specified time.   The notice is for the
protection of the settler, not of the government.''

In *In re Pre-emption Declaratory Statement of Ellen Bar-
ker*, 4 Decisions of Land Department of Interior, 514, 515,
it is held: ''The filing of a declaratory statement is not
made a condition precedent to the exercise of the pre-
emption right (sec. 2259, R. S.) ; it is merely a protection
against the claims of subsequent settlers,'' citing *Johnson* v.
*Towsley*, 13 Wall. (U. S.) 72 [20 L. Ed. 485, see, also,
Rose's U. S. Notes].

In *In re Pre-emption Entry of Paris Meadows et als.*, 9
Decisions of Land Department of Interior, pages 41, 44, it is
said: ''What then is the office of the declaratory statement?
It is a notice given by the settler of his intention to pur-
chase the land described therein, and such notice protects
for a limited time his claim against subsequent settlers, by
being duly filed in the proper local land office, where it is
to be noted on the proper record.   Anyone thereafter seek-
ing to claim the land is not prohibited from putting a claim
of record, but he is notified that he does so subject to the
claim of the pre-emption declarant whose intention has thus
been announced.''   (See, also, 10 Decisions of Department
of Interior, pp. 617, 618.)

The case of *Lockwitz* v. *Larson*, 16 Utah, 275 [52 Pac.
279], is illuminating upon the matter in hand.   That case
involved a contest over lots in a town site located under
the act of Congress of 1867, and it is therein held, in effect,
that, as to the location of town sites on government domain,
under the act of Congress of 1867, the filing of a declara-
tory statement by the proper officers is an ''entry'' within
the meaning and intent of said act, and further held that
''the interests of the occupants attach simultaneously with
the making of a town site entry, and that no person who
may have occupied land on the town site previous thereto,
or may occupy such lands thereafter, but who was not a
settler and occupant at the time of the entry, is a benefi-
ciary under the act, nor can such person derive any benefit
directly by reason of said entry.''

[1] It is to be conceded, of course, that the filing of a
declaratory statement is not necessary to the location of a
town site, yet, as has been shown, it is proper under the
act of Congress of 1867 to take that course as the initial

step for making a town site entry in preference over the making of a cash entry as the first step looking to the pre-emption of lands for such a purpose; and, while the scope of a declaratory statement does not extend as far as a cash entry in the preservation of the rights of the settlers; while, in other words, the declaratory statement may not be an actual entry in the same sense that a cash entry is and, to effectually serve the purposes for which it is intended, must be kept alive by following it up within proper time after it has been filed by other steps essential under the law to the establishment of a town site, yet the effect of such filing is, even if not as against the government, certainly as against the claims of others, to vest in those who are actual or *bona fide* settlers upon and occupants of portions of such lands at the time of the filing of such statement an inceptive right to the portions so settled upon and occupied.

[2] It follows from the conclusion thus announced that, unless the evidence is such as to support the implied finding of the court that Chesrown was an actual settler upon and occupant of the land claimed by the defendant Mercantile Company, prior to and at the date of the filing of the declaratory statement on July 11, 1868, the judgment in favor of said defendant cannot be upheld; and so this brings us to an examination of the evidence.

In the first place, it is to be observed that a map made in 1863 was introduced in evidence and thereon block six was marked and designated as public commons and the Bethel map, as seen, corresponds in that particular with said map of 1863. We refer to the last-mentioned map because it is stated by counsel for the defendants that there is no evidence to show that prior to the survey of the town site made by Bethel in 1871 block six constituted a public commons and because, also, they contend that the mere fact that Bethel marked and designated block six on his map as public commons is not evidence that the block was previously regarded as public commons. Now, as to the Bethel map on which the whole of block six is marked and designated as public commons, said map, having been made by and under the authority of the act of the legislature of 1867 and 1868, *supra*, constitutes by virtue of the provisions of section 3 of said act, "*Prima facie* evidence of the contents and correctness thereof in all the courts of this

state." Hence, the burden was upon the defendant Mercantile Company to overthrow or overcome, by competent evidence, the fixed probative effect imparted by the law to said map and the field-notes made at the same time. This burden the Mercantile Company failed to sustain. Indeed, a careful examination of the record has firmly convinced us that Chesrown at no time, either prior or subsequent to the filing of the declaratory statement, was an actual settler upon any part of block six, unless the wharf built by him over the water from said block may be deemed to be a portion thereof. In other words, there is no evidence showing that he ever settled upon or occupied the portion of block six now claimed by the defendant Mercantile Company, and that all that he ever did claim was the right to pass over the road crossing block six and leading to his wharf—that is, a right of way over the commons. He testified that he first went to Tahoe City in the year 1869 and departed therefrom permanently in the year 1877. He did not, however, reside continuously at said town during the period from 1869 to 1877, but during a part of the years 1869, 1871, and 1876 worked at Truckee and other places. In the fall of 1871, though, he started the construction of a wharf or pier on the lake, the same extending from the shore line of block six into and over the lake for a distance of about 150 feet. Upon this wharf or pier, at the extreme eastern end thereof, he erected, in the year 1872, a building, which he used for a warehouse and a saloon and which he termed, as it has ever since been known, the "Tahoe Custom House." He stated that he started the saloon in said building in the month of May, 1873, and conducted it until the fall of 1873, when he sold the wharf and custom-house to two parties named A. F. Campbell and J. O. Forbes. Here we may state that there is a variance between the testimony of Chesrown and the deed to Campbell and Forbes as to the time when the transfer was made. It is probable that Chesrown meant to testify that he opened the saloon in 1872, for the deed to his grantees was dated January 27, 1873. But this variance is immaterial. The deed conveyed to Campbell and Forbes whatever title Chesrown had "in a certain peace of property situated at Tahoe City . . . , known as the Lake Tahoe Custom House, together with all lumber on hand, wharves,

warehouses, break wattrs, furnutur, fictures with lands rodes & leading to the above described property.'' (This conveyance is the foundation and source of the Mercantile Company's claim to title to the portion of block six now occupied and claimed by it.)

Chesrown testified that when he built his wharf the land known as public commons (block six) was not occupied by anyone; that he never made use of the land adjacent to the wharf; that there was an old barn standing on the block, but that he did not know who put it there; that no one claimed to own the barn and different persons at different times, including himself, had used it for temporary purposes and convenience. He said that he never claimed any part of block six and had never continuously occupied or used any part of it except a road leading to the wharf and passing over and through the commons, and that such use was only that which was common to the general public. He testified that he never at any time claimed to own the barn referred to and that while he was the owner of the custom-house he did not know of anyone claiming to own the commons or any part of them; that he never used any land around the wharf and that he did not build a store there. He stated that he assisted Bethel a part of one day in the survey of the town site. While assisting the surveyor, he said he did not go out on the commons and point out any particular piece of land thereof which he claimed that he had ever settled upon or occupied, but that he merely told Bethel that he would like to have him mark out a passageway or roadway over the commons to his wharf for his convenience and that of others going to the wharf. It was, however, shown that, in a deposition taken prior to the trial, Chesrown stated that while the survey of the town site was being made by Bethel he (Chesrown) pointed out and indicated to the surveyor the portion of the block now claimed by the Mercantile Company as the portion thereof that he ''calculated to get a deed to,'' and that he requested Bethel so to mark the said block on the map. In fact, as to this matter, his deposition showed that he deposed as follows: ''I know I told him [Bethel] I wanted the piece of land there for a landing and told him to make that out when he was making the map, and to make so much front, and I thought he done it—he made the map right

there in the hotel after he got done surveying.'' He stated
in his deposition that he pointed out the boundary lines of
the portion that he claimed, and those lines correspond
with those within which the portion of block six claimed
by the Mercantile Company is embraced.

It is very clear from the foregoing testimony that, as
stated before, Chesrown never claimed any portion of block
six and much less was he a settler upon any portion of said
block at the time of the filing of the declaratory statement.
As a matter of fact, the deed from Chesrown to Campbell
and Forbes, it will be observed, does not convey or purport
to convey the lot claimed by the Mercantile Company as
described in the pleadings. All that the said deed pur-
ports to convey is the wharf and the road or right of way
leading thereto. It is true the word ''lands'' is used in
the deed, but since it was unquestionably shown by Ches-
rown's own testimony that he never settled upon or claimed
the land adjacent to his wharf, it would seem that what he
meant by the use of the word ''lands'' was the right to
pass over the road leading to his wharf, which road, as
we have seen, passed over and across block six. It is also
a circumstance of some significance that Chesrown did not
mention in his deed to Campbell and Forbes the barn re-
ferred to. It is obvious from this that, as he testified, he
never made any claim of ownership of said barn or the
ground upon which it stood. The fact that he told the sur-
veyor that he desired to claim or get a deed to the portion
of said block now claimed and occupied by the Mercantile
Company is of no legal consequence. The act of Congress
under which town sites may be located or established on
the public domain intends that the same may be done en-
tirely for the benefit of those who are actual settlers upon
said town site at the time that any authorized initial step
for such location is taken, and it is as clear as any proposi-
tion can be that the mere intention of a party to claim
any portion of such town site, unaccompanied by the act of
settling upon the same, cannot have the effect of vesting in
such person any right whatsoever to the piece of land which
thus he has in mind.

Thus (to repeat) it is plain that Chesrown was not, nor
did he pretend to be, a settler upon any part of the commons
involved in this litigation at the time of the filing of the

declaratory statement. Indeed, it is not shown by any evidence in the case—not even by his deposition, of which certain portions got into the record for impeachment purposes only—that he was a settler upon any part of the commons at the time of the making of the cash entry in the month of December, 1871. It, of course, follows that the claim of the Mercantile Company, based as it is entirely upon the asserted rights of Chesrown, is wholly without a valid foundation and cannot be sustained, unless we are required to uphold its contention that the plaintiffs are estopped from maintaining this action as against it because it was shown that the said defendant, with the knowledge and tacit assent or acquiescence of the plaintiffs, had for many years continuously been in possession of and had erected and at great expense maintained buildings for business and other purposes upon the lot claimed by it. In other words, the point is that the said defendant had put expensive improvements upon said lot and had maintained the same for many years under a claim of right and that the plaintiffs during all those years had knowledge of those facts and by silence had consented thereto. **[3]** This involves the plea of the doctrine of equitable estoppel or estoppel *in pais,* but, assuming that such a defense is appropriate to a case of this character, the answer to the contention is that estoppel was not pleaded, and it is so well settled that authorities need hardly be cited in support of the proposition that where a party relies upon estoppel *in pais* it is his duty to plead it, and where he has failed to do this the question cannot be considered. (See *Burk* v. *City of Santa Cruz,* 163 Cal. 807, 810, 811 [127 Pac. 154]; *Clarke* v. *Huber,* 25 Cal. 593; *Chapman* v. *Hughes,* 134 Cal. 641 [58 Pac. 298, 60 Pac. 974, 66 Pac. 982]; *Delger* v. *Jacobs,* 19 Cal. App. 197, 206 [125 Pac. 258].)

We are now brought to the consideration of the appeal by the Lake Tahoe Railway & Transportation Company. As seen, it is first contended by said company that it derived the right to the portion of block six over and across which its tracks are maintained and upon which it maintains certain buildings from the board of supervisors of Placer County. This defendant also undertakes to invoke the doctrine of equitable estoppel as a defense against the action by plaintiffs. But as to this last proposition we may as well

here say that, since it is true that this defendant did not plead estoppel or rely upon it as defense in the court below, what we have said upon that subject in disposing of the appeal of the Mercantile Company is equally applicable to the attempt of the Railway Company now to avail itself of the defense of estoppel as against the right of the plaintiffs to maintain the action against it.

[4] The contention of the Railway Company that its right to occupy the portion of block six over which its tracks cross was granted to it by the board of supervisors is, in our judgment, not sustained by the record. The resolution by the board of supervisors in terms merely granted to said defendant the right to cross the road, known as the Truckee and Tahoe turnpike, "at any and all points, and also a right of way along such parts of said road as the said company may desire to use for the line of said railway as shown by the map of preliminary survey and map of location to be hereafter filed." It will be noted that there is nothing in this resolution or purported franchise which expressly vests in the Railway Company the right to run its tracks over or across block six or to erect and maintain buildings thereon. This right, however, in so far as the maintenance of its tracks and switches is concerned, might be implied from the fact, if it were a fact, that the turnpike crosses the commons and the line of tracks of the Railway Company runs along so much of said turnpike as passes through and over the commons. But, in the first place, it is to be stated that it is not clear that the wagon road running through the commons is a part of the Truckee and Tahoe turnpike. There is, in other words, no evidence which satisfactorily shows that the road passing through the commons is any part of the turnpike, and in support of the claim that it acquired the right to run and maintain its tracks over and across the commons, the burden was upon the Railway Company unmistakably to show that the road passing through the commons was a part of the turnpike. This necessarily must be true, since the right purporting to be granted by the board of supervisors to the Railway Company to run its tracks along and across the said turnpike is expressly limited to the route of said turnpike, and the maintenance of its line of tracks along any other way or route would be beyond the terms of the

purported franchise. In the second place, it is to be said that, even if the roadway running through the commons is a part of the turnpike, it appears from the evidence without conflict that the Railway Company did not run the portion of its tracks through the commons along such portion of said turnpike, but that it located its tracks on the commons a considerable distance from and west of said road. This, of course, was not in accordance with any right which the resolution of the board of supervisors purports to grant to the company.

[5] But there is, it seems to us, another answer to the claim that the Railway Company legally derived any right from the board of supervisors as a result of the resolution referred to. Section 5 of the act of 1868, as seen, provides that all streets, roads, etc., cemeteries, squares, and commons, marked and platted on the map of the town site as prescribed and directed by the provisions of said act, shall be deemed and considered and "they are hereby declared to be, dedicated to public use, by the filing of such town plat in the office of the County Recorder, and *shall be inalienable, unless by special order of the Board of Supervisors of the county,* so long as such town shall remain unincorporated." It is the contention of the Railway Company that it was in pursuance of the authority impliedly given the board of supervisors by the italicized portion of the foregoing provision of the act of 1868 that the resolution granting said company a right of way over block six was adopted. Indeed, if any authority existed in the board of supervisors to grant a railway company a right of way over the public commons of the town site in question it is to be found alone in section 5 of the act of 1868 as above quoted herein. But a serious question arises as to whether the provision referred to is to be given the construction to which counsel for defendants here attempt to subject it. We do not think the construction so given is sound. The public commons and all other pieces of property located within the town site and dedicated to a public use were and are held in trust by the authorized public authorities for the benefit of the inhabitants of the town of Tahoe City, and it certainly was not intended by the legislature that the board of supervisors of the county should be vested with the arbitrary power of diverting the

trust from its expressed purposes or of disposing of such pieces of property without the consent of those for whose benefit such property was set aside and held. It is not made to appear that such consent was given. It is true that the statute makes no express provision requiring such consent to be expressed, but the very fact that the lots which were dedicated to public use were intended to be and are held in trust for the benefit of the inhabitants of the town of Tahoe City is itself sufficient to preclude the idea that such property might be disposed of by the board of supervisors without first obtaining the consent of the beneficiaries of the trust. Moreover, it is very clear that, even if the board of supervisors had the power to transfer such property and so allow it to be converted to other uses than that to which it is dedicated, it would not have the authority to make a gift of the property, nor cut it up by granting rights of way either for railroads or other kinds of roads over and across the same. Manifestly, the provision under consideration is not limited in its application alone to public commons. It has application to all the pieces or parcels of property embraced within the town site which are dedicated to public use, and obviously it is not a reasonable assumption that it was intended that the board of supervisors should thus be vested with power to grant rights of way for a railroad over and across a cemetery or a school lot. There can be no doubt that the provision referred to was intended for the benefit of the inhabitants of the town, and its purpose probably was to enable them, whenever it might appear best for the public interests or the public convenience, to change the locations of their cemeteries, public schools, squares, and commons from where they are designated on the map to other places within the town site, in which case, we assume, if found necessary to do so, the board of supervisors may, upon request of such inhabitants, expressed in appropriate form, authorize by special order the sale of such lots, for the benefit, however, of the inhabitants.

There is no legal force to the contention of the plaintiffs that that part of the decree which permits and orders the removal by the Railway Company of the tracks, buildings, structures, etc., maintained on block six by said defendant, is erroneous. The record shows that the structures

erected and maintained on the property, aside from the railroad tracks, consist of a couple of cabins, a paint-shop, a shed, a cottage, an engine-house, and a car-barn. These were erected and used as essential equipments of the Railway Company "plant," so to speak, or used in aid of the operation of the business of said defendant as a transportation company. The argument is that these structures became and are a part of the realty by virtue of the provisions of sections 660 and 1013 of the Civil Code.

It is not necessary in this case to enter into a general or an exhaustive discussion of the principles underlying the law of fixtures or to undertake to distinguish the occasions on which personal property annexed to real property becomes a part of the latter from those on which such property when so annexed retains its original identity. [6] It is enough to say that, generally speaking, the question whether personal property affixed to land becomes a part thereof is largely one of intention, and this intention is to be determined by certain general tests, of which the one most pertinent to the present consideration is the adaptation or application of the personal property to the use or purpose to which that part of the realty to which it is connected is appropriated. (See 10 R. C. L. 1059; 11 R. C. L. 1062; *Breyfogle* v. *Tighe et al., ante,* p. 301 [208 Pac. 1008].) In this case, it must be borne in mind, the personal property affixed to the land by the defendant Railway Company was for the purposes of its business as a transportation company. A railroad company is a public agency and an instrument of commerce and its tracks and the buildings necessary to carry on its purposes are mere accessories to the operation of its business. [7] The public necessity or requirements or the very exigencies of its purposes may at any time make it convenient and to the interest of the public as well as to itself to abandon a certain right of way and remove its tracks and equipments to another, and, therefore, we think it only responsive to sound reason to say that where a railway company lays its tracks and erects buildings for the proper conduct of its transportation business over and across land under a claim of right, such property cannot be held to become a part of the realty, but will at all times retain the character of personalty. The view thus expressed is sustained by a large

number of cases, to which we will make simple reference without reproducing the expressions found therein. (*St. Louis etc. R. Co.* v. *Nyce*, 61 Kan. 394 [48 L. R. A. 241, 59 Pac. 1040]; *Wagner* v. *Cleveland etc. R. Co.*, 22 Ohio St. 563 [10 Am. Rep. 770]; *Atchison etc. R. Co.* v. *Morgan*, 42 Kan. 23 [16 Am. St. Rep. 471, 4 L. R. A. 284, 21 Pac. 809]; *Sangamon etc. R. Co.* v. *Morgan County*, 14 Ill. 163 [56 Am. Dec. 497]; *Randall* v. *Elwell*, 52 N. Y. 521 [11 Am. Rep. 747]; 11 R. C. L., pp. 1079, 1080, and cases cited in the footnotes.) The maintenance of railroad tracks and the essential equipments of the transportation business upon a piece of land involves as a rule the appropriation of so much of the land thus occupied to a use or purpose to which it is not naturally or customarily adapted. In other words, when realty is so appropriated and used, it is not devoted to the ordinary or usual purposes or uses of land. Nor, obviously, can it be said that the structures erected upon the land in dispute has had or can have the effect of enhancing the value of the land or improving or benefiting it for the purpose to which otherwise it might be devoted or in ordinary circumstances is adapted.

[8] We have now considered all the points discussed in the briefs with the exception of that involving the plea by all the defendants of the statute of limitations, as to which it is sufficient to say that it is well settled that where a piece of ground is reserved for or dedicated to public purposes and, therefore, becomes public property, title thereto cannot be acquired as against the public by adverse possession and the right of action to recover possession of the same for the public purposes to which it has been dedicated is not subject to the statute of limitations. (*Board of Education* v. *Martin et al.*, 92 Cal. 209 [28 Pac. 799], and cases therein cited; *Howard* v. *Oroville School District*, 22 Cal. App. 544, 551 [135 Pac. 689].)

For the foregoing reasons, that part of the judgment affecting and in favor of the Tahoe Mercantile Company is reversed and that part of the judgment in favor of the plaintiffs and against the Lake Tahoe Railway & Transportation Company, including the part thereof awarding to said Lake Tahoe Railway & Transportation Company the right

to remove its tracks, buildings, and equipments from said Block Six of said Tahoe City, is affirmed.

Burnett, J., and Finch, P. J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on October 19, 1922, and the following opinion then rendered thereon:

THE COURT.—The application for a hearing in this court after decision by the district court of appeal of the third appellate district is denied.

In denying the petition for transfer to this court we withhold approval of that portion of the opinion dealing with .the power of the board of supervisors to grant rights of way across the common. Inasmuch as the opinion holds that the supervisors did not make such grant it is unnecessary to determine that question.

Wilbur, Acting, C. J., Richards, J., *pro tem.*, Lennon, J., and Lawlor, J., concurred.