[Civ. No. 441. Fourth Appellate District.—November 14, 1930.]

## J. J. RICHERT, Respondent, v. CITY OF SAN DIEGO (a Municipal Corporation), Appellant.

M. W. Conkling, City Attorney, and H. C. Hopkins, Deputy City Attorney, for Appellant.

Herbert C. Kelly for Respondent.

CARY, P. J.—Plaintiff brought this action against the City of San Diego to quiet title to certain land within the city limits of the City of San Diego. The complaint contains the usual averments. The answer denies plaintiff's ownership and right to possession and admits that the defendant claims a right to the property in question.

The cause was tried upon an agreed statement of facts. The court found that plaintiff was the owner in possession and entitled to the possession of the property in question; that defendant claimed title to said property, but that the same was without right. Judgment was given in favor of plaintiff.

The defendant, City of San Diego, urges as grounds for reversal, (1) that the statement of facts contains only probative as distinguished from ultimate facts and therefore findings are necessary, that the findings as made are insufficient because the elements of adverse possession are not severally found, that, even if the court's findings are sufficient, the agreed statement is insufficient to support them because the agreed statement contains no sufficient facts regarding the hostility of the possession or the notice to defendant of such possession; (2) that defendant City of San Diego holds these pueblo lots in trust for the use of the public and does not hold them in a proprietary capacity and hence the land may not be taken from the City by adverse possession, and (3) that since the legislature directed that these pueblo lands be reserved from sale until 1930 that fact in itself shows a clear intention of the state to except this land from adverse possession.

Omitting the formal parts, the agreed statement is as follows:

"Reference is hereby made to Plat of the City of San Diego filed herewith marked Exhibit 'A' upon which diagram

the property adjacent to that involved in this action is marked with the letter 'R' in red ink in such cases as the Pueblo lot so marked is owned by the plaintiff and is marked with the word 'city' in print in such cases as the Pueblo lot so marked is owned by the defendant. On said diagram the property involved in this action is cross-hatched in blue ink and the red lines shown on said diagram represent the approximate location of fences as the same now exist and have existed for twelve (12) years last past. Of said fences so shown on said diagram those along the Right-of-Way of the Santa Fe Railway were constructed many years ago by said Railroad Company. The fence surrounding the enclosure including the Northerly portion of Pueblo Lot 1292 and adjacent tracts was built by plaintiff. The most Southerly, East and West fence line shown on said diagram was built by the owners of the land lying South thereof. The two cross-fences indicated by wavy lines running from said most Southerly fence line Northerly to the Santa Fe Railroad were built by plaintiff about 1914. By agreement between plaintiff and Max Watson, then City Forester in charge of the City Pueblo Lands, plaintiff built the fence indicated by red line following the Highway from the Northerly line of Pueblo Lot 1299 Northerly and thence Easterly along the Linda Vista Highway to the City Limits and defendant City built the two cross-fences indicated on said diagram running Southerly from said Highway, marked on said diagram as Linda Vista Road, to the Santa Fe Railroad Right-of-Way; at the same time defendant City constructed the fence along the Northerly boundary of the tract in dispute in this action from the Westerly line of Pueblo Lot 1278 to the Easterly boundary of Pueblo Lot 1292. About seven years ago plaintiff constructed two cross-fences dividing into three parcels the land involved in this action lying North of the Railroad Right-of-Way, the approximate location of which cross-fences is shown on this diagram by red lines. Since the construction of said fences about twelve years ago the portion of the land involved in this action lying North of the Railroad Right-of-Way has been continuously enclosed by the fences previously mentioned and has been occupied by the plaintiff continuously throughout said period having been cultivated by him and his tenants with crops of beans and hay raised thereon

during eight or nine consecutive years of said period, since which time and during the portions of said years in which cultivation occurred while the land was not used in actual cultivation the land has been used continuously for pasturage purposes by plaintiff. Throughout said period of the twelve years last past the portion of said premises in controversy lying South of the Railroad Right-of-Way has been used continuously by plaintiff for pasturage purposes. Throughout said period plaintiff has owned and operated a dairy and cattle ranch, the headquarters of which are indicated on Exhibit 'A' by the words 'ranch houses' and the land enclosed as shown on said Exhibit 'A' has, throughout said period been used by him continuously for pasturage for cattle varying in number from approximately one hundred fifty to approximately three hundred head.

"It is further stipulated that no taxes of any nature whatsoever have been assessed upon or against the property involved in this action at any time during said period of the last twelve years; that plaintiff has made application to pay both city and county taxes upon said property in dispute but that payment of said taxes has been refused upon the ground that said land did not appear upon the assessment rolls.

"Throughout said period of approximately twelve years last past, the possession of the property in dispute by plaintiff has been under claim of right and has been exclusive of all other persons and hostile to the claims of defendant City and all other persons; that no person other than plaintiff has occupied any of said property in dispute herein at any time during said period of twelve years and that the use and occupancy of said property by plaintiff and plaintiff's claim of title thereto was known throughout said period to the occupants of adjoining and nearby lands.

"It is hereby further stipulated that the copy of the Pascoe Map of the Pueblo Lands of the City of San Diego on file in the office of the Recorder of San Diego County as Miscellaneous Map No. 36 is deemed to have been duly admitted in evidence in this action.

"It is further stipulated that all of the property in dispute in this action lies within the Pueblo lands of the City of San Diego as shown on said Pascoe Map and that all of the property involved herein lies North of the

San Diego River and that the record title to said Pueblo Lands was acquired by grant to the Pueblo of San Diego and confirmed by United States patent.''

When construed with the plat exhibit ''A'' it reveals the following: The land in controversy is approximately rectangular in shape, its length from east to west being some four times its depth from north to south. Running from east to west through this land are the tracks of the Santa Fe Railway, which divide the land into a north and south half of nearly equal size. As the facts regarding these two halves are different, they may best be described separately.

The parcel lying north of the tracks had, for twelve years immediately preceding the commencement of this action, been completely inclosed by a fence. It is bounded on the north by land belonging to the defendant City, on the south by the Santa Fe Railway right of way and on the east and west by land belonging to plaintiff. This northerly tract has for said twelve years been occupied by plaintiff continuously having been cultivated with crops of beans or hay for eight or nine consecutive years and when not so cultivated used by plaintiff continuously for pasturage.

The tract lying south of the Santa Fe right of way, while fenced on its northern boundary by the right of way fence of the railway, has no fence erected on its eastern, southern or western boundaries. However, it forms part of a larger area, the rest of which is owned by plaintiff, and around the outer limits of which there has been a fence for said twelve-year period. Regarding this tract of land, the statement of facts recites, ''Throughout said period of the twelve years last past the portion of said premises in controversy lying south of the railroad right of way has been used continuously by plaintiff for pasturage purposes.''

■ Regarding the question of findings, plaintiff concedes that the facts set forth in the statement are probative in character rather than ultimate. Findings are therefore necessary. (*Crisman* v. *Lanterman*, 149 Cal. 647, 654, 655 [117 Am. St. Rep. 167, 87 Pac. 89]; *Zimmerman* v. *Continental Life Ins. Co.*, 99 Cal. App. 723, 727 [279 Pac. 464].)

■ The court's findings follow the language of the complaint and find the ultimate fact of ownership in the plaintiff. This is sufficient, no finding of the several elements necessary to make the possession adverse being necessary.

(*Montecito Valley Water Co.* v. *Santa Barbara,* 144 Cal. 578, 594 [77 Pac. 1113]; *Cooley* v. *Miller & Lux,* 156 Cal. 510, 523 [105 Pac. 981]; *Aronson & Co.* v. *Pearson,* 199 Cal. 295, 304, 305 [249 Pac. 191]; *Colver* v. *W. B. Scarborough Co.,* 73 Cal. App. 421, 433, 434 [238 Pac. 1096].)

█ Does the agreed statement support the court's findings? Defendant urges particularly that it is insufficient, first, because it contains no showing of the hostile character of plaintiff's occupancy; second, because it contains no showing of notice to defendant, and, third, because it contains no showing that the land had been cultivated or improved or protected by a substantial inclosure: In support of its contention defendant cites: *Saecker* v. *Cohn,* 180 Cal. 151 [179 Pac. 890]; *Pacific Gas & Elec. Co.* v. *Crockett L. & C. Co.,* 70 Cal. App. 283 [233 Pac. 370]; *Cory* v. *Hotchkiss,* 31 Cal. App. 443 [160 Pac. 841]; *DeFrieze* v. *Quint,* 94 Cal. 653 [28 Am. St. Rep. 151, 30 Pac. 1]; *Brandon* v. *Umpqua Lumber Co.,* 26 Cal. App. 96 [146 Pac. 46]; *Secret Valley Land Co.* v. *Perry,* 187 Cal. 420 [202 Pac. 449]; *San Francisco Credit Clearing House* v. *Wells,* 196 Cal. 701 [239 Pac. 319]; and *Kern County Land Co.* v. *Nighbert,* 75 Cal. App. 103 [241 Pac. 915]. We have carefully examined the authorities cited by defendant and have concluded that there is no merit to this contention.

Regarding the contention that the lands are of such character that they may not be taken from the defendant City by adverse possession, it may be noted at the outset that certain principles have been well established by our courts.

█ Where land held by the state or any of its subdivisions has been actually reserved for or dedicated to some specific public use there can be no adverse holding thereof which can give title to the adverse claimant. (*Board of Education* v. *Martin,* 92 Cal. 209, 213, 217 [28 Pac. 799]; *County of Placer* v. *Lake Tahoe R. Co.,* 58 Cal. App. 764, 783 [209 Pac. 900]; *San Francisco* v. *Bradbury,* 92 Cal. 414, 418 [28 Pac. 803]; *Holladay* v. *San Francisco,* 124 Cal. 352 [57 Pac. 146]; *San Diego* v. *Cuyamaca Water Co.,* (Cal.) 278 Pac. 840; *San Diego* v. *Cuyamaca Water Co.,* 209 Cal. 105 [287 Pac. 475]; *Hoadley* v. *San Francisco,* 50 Cal. 265; *Mills* v. *City of Los Angeles,* 90 Cal. 522, 532 [27 Pac. 354]; *County of Yolo* v. *Barney,* 79 Cal. 375, 378, 379 [12

Am. St. Rep. 152, 21 Pac. 833].) And this is the law regardless of whether or not the land be of pueblo origin. (*County of Placer* v. *Lake Tahoe Ry. Co., supra; County of Yolo* v. *Barney, supra.*)

■ The law is likewise clear that if land held by the state or any of its subdivisions is neither reserved for nor dedicated to some public use and may be alienated by its owner, title may be wrested from it by adverse possession. (*Board of Education* v. *Martin,* 92 Cal. 209, 213 [28 Pac. 799]; *Ames* v. *City of San Diego,* 101 Cal. 390, 393, 394 [35 Pac. 1005]; *Humboldt Co.* v. *Van Duzer,* 48 Cal. App. 640, 643, 644 [192 Pac. 192]; *People* v. *Banning Co.,* 167 Cal. 643, 649 [140 Pac. 587]; *Orack* v. *Powelson,* 3 Cal. App. 282, 285 [85 Pac. 129]; *San Francisco* v. *Straut,* 84 Cal. 124 [24 Pac. 814].)

■ The agreed statement of facts does not show that the lands in question are either reserved for or. dedicated to some specific public use. It does show, however, that the property lies within the pueblo lands of San Diego at a point north of the San Diego River and that the record title thereto was acquired by grant to the pueblo of San Diego and confirmed by United States patent. The question is then presented: May the pueblo lands of the City of San Diego which are neither reserved for nor dedicated to some specific public use be taken from that City by adverse possession?

Appellant contends that all land owned by the former pueblo, now City, of San Diego, except such land as is held by it in trust for the mere purpose of conveying the legal title thereto to its true owner, is held by it in trust for the benefit of the inhabitants of the City, and that such fact, in and of itself, puts the land on a parity with land expressly reserved for or dedicated to a particular public use and therefore exempts it from claim under adverse possession. In a brief, which gives evidence of extended research, practically every one of the many cases to be found in the reports of our own state and those of the United States Supreme Court bearing on the origin and history of the Mexican pueblo and the many interesting questions which have arisen peculiar to the nature of the pueblo lands has been cited. Any extensive quotation from these authorities or a repetition of this history as there dis-

closed would extend this decision unduly, and we shall therefore confine ourselves to a brief statement of such facts or legal principles as have been established, together with a citation of the cases in support thereof.

The question of the origin of the pueblo lands and their precise status has been the subject in this state of numerous decisions, many of which are of great length and have traced the history of the pueblo back to Spain, the country of its origin. In *Vernon Irr. Co.* v. *Los Angeles,* 106 Cal. 237, 245–247 [39 Pac. 762], we find the essential differences between the ownership of lands within the limits of the pueblo or town under the Spanish and Mexican law and land ownership within the typical town or city of our country set forth in a singularly clear manner. The four square leagues of land usually granted to pueblos were by the latter's authorities divided into classes, most of which were for the common use of the inhabitants. But there were some classes of these lands which might be reduced to private ownership, such as the *solares,* upon which were built dwellings and stores, and the *suertes,* used for cultivation or planting. (*Hart* v. *Burnett,* 15 Cal. 530, 553–555.) The land within the pueblo limits, except such *solares* and *suertes* as had been reduced to private ownership, was held by the pueblo in trust for the benefit of the inhabitants. (*Townsend* v. *Greeley,* 5 Wall. (U. S.) 326 [18 L. Ed. 547, 549, see, also, Rose's U. S. Notes]; *Hart* v. *Burnett, supra,* at pp. 557, 568, 569, 573, of 15 Cal.; *San Francisco* v. *Canavan,* 42 Cal. 541, 555–557.) The pueblo, however, did not have the absolute control of these lands, even for the purposes of the trust under which they were held, for, while under the Mexican system the pueblo might dispose of the land in pursuance of the trust under which it was held, yet the Mexican government had the power to direct how the trust should be executed and to enlarge or limit the power of the pueblo with respect to its disposition of these lands. The Mexican government further had the power to dispose of these lands itself without the consent of the pueblo authorities. (*San Francisco* v. *Canavan, supra,* p. 555, of 42 Cal.) When the United States took over what is now California no change in the status of privately owned land occurred. (*Teschemacher* v. *Thompson,* 18 Cal. 11, 22–24 [79 Am. Dec. 151]; *Ward* v. *Mulford,* 32 Cal. 365, 372.) In fact,

under the terms of the treaty of Guadalupe Hidalgo, it became the duty of the United States to protect all rights of property emanating from the Mexican government previous to that treaty. (*Knight* v. *United Land Assn.*, 142 U. S. 161 [35 L. Ed. 974, 982, 12 Sup. Ct. Rep. 258, see, also, Rose's U. S. Notes].) In due course, the power formerly lodged in the Mexican government regarding the management, control or disposition of these pueblo lands became vested in the state of California, to be exercised by its legislature, and has there since remained, except in such instances as that body has in turn delegated it to the municipal authorities. (*San Francisco* v. *Canavan, supra*, p. 557, of 42 Cal.; *City of Monterey* v. *Jacks*, 139 Cal. 542 [73 Pac. 436].)

With this general background we now address ourselves to the precise situation of the pueblo lands of the City of San Diego. The Freeholders' Charter of San Diego adopted in 1889 (Stats. 1889, p. 643, provides, art. II, chap. 2, sec. 1, subd. 50) that the common council shall have power "to provide for the sale and conveyance or lease of all lands now or hereafter owned by said City not dedicated or reserved for public use". In 1909, by an amendment to this subdivision 50 (Stats. 1909, p. 1147), all pueblo lands owned by the City in the district where the lands here in controversy are situated (north of the San Diego River) were reserved from sale by the City until 1930, "provided however, that at any time should it be desired to sell any part or portion of such public lands prior to the year 1930, the sale thereof may be authorized by an ordinance duly passed by the common council and ratified by the electors of the City of San Diego at any special or general municipal election". As to all other land owned by the City not dedicated or reserved for public use the common council retained the same power of sale, conveyance or lease as was given by the 1889 charter. (Stats. 1909, p. 1147.) Both the 1889 Freeholders' Charter and the 1909 amendment thereto had, of course, received the vote of the electors of San Diego before being submitted to and approved by the legislature. It will thus be seen that for a period of twenty years—1889 to 1909—the City of San Diego through its common council was empowered to sell the pueblo lands which are the subject of controversy here. It will further

be seen that for twenty years thereafter—1909 to 1929—the power of sale of the lands here involved was still retained by the City, but with the added provision that any ordinance authorizing a sale must first be ratified by the electors of the City. The adverse possession in the case at bar occurred during the last twelve years of this second twenty-year period.

Briefly to sum up the situation as developed thus far we find that the lands in question, while of pueblo origin, have never been either dedicated to or reserved for a specific public use. Furthermore in the days when San Diego was a Mexican pueblo the government of Mexico had plenary power to control the manner of sale of these pueblo lands by the municipal authorities and the Mexican government could also without consulting the municipal authorities dispose of the pueblo lands of San Diego as its judgment might dictate. Also the state of California—the sovereign power which had succeeded to the plenary powers over pueblo lands formerly possessed by the government of Mexico—had, through its legislature in conjunction with the vote of the electors of San Diego, given to the City of San Diego the power to alienate or sell these pueblo lands, and the City of San Diego had possessed that power absolutely for the twenty years from 1889 to 1909 and qualifiedly for the succeeding twenty years from 1909 to 1929.

In three cases our Supreme Court has heretofore passed directly on various questions incident to the pueblo lands of San Diego.

The earliest of these is *Ames* v. *San Diego*, 101 Cal. 390 35 Pac. 1005], decided in 1894. There plaintiffs, solely by virtue of adverse possession, claimed title to certain pueblo land on which they had erected a house and in which they and their grantors had lived continuously since 1846. The findings of the trial court did not attempt to define the nature of the title which defendant City of San Diego had in this land beyond a mere statement that in 1874 the title of the City of San Diego as successor to the Mexican pueblo of San Diego had been confirmed by the United States "as the pueblo lands of said defendant and in trust for municipal purposes". In its decision our Supreme Court, recognizing that such property was held in trust by San Diego for its inhabitants to the extent that it could

not be sold under execution issued upon a money judgment against the City, then quoted from *Hart* v. *Burnett, supra,* to the effect that the *solares*—i. e., building lots—and the *suertes*—tracts for cultivation or planting—could be disposed of by the pueblo to the settlers for their individual and exclusive benefit. It then held that pueblo lands held by the City, not dedicated to some specific public use, and which were capable of alienation by the City, were subject to acquisition by adverse possession. As showing the significance which our Supreme Court attached to the fact that the City possessed the power of alienation we quote the following from 101 Cal., page 394:

"As to land which is the subject of alienation, we are clearly of the opinion that the title of the City thereto may be lost by the adverse possession of another for the requisite period of time; and in regard to pueblo lands of this latter character, such as house lots, we see no reason why the statute of limitations should not apply in favor of an adverse possessor precisely the same as if such land had been acquired by the City by purchase and for purposes of sale, or for any other use not strictly municipal."

The second of these is *San Diego* v. *Linda Vista Irr. Dist.*, 108 Cal. 189 [35 L. R. A. 33, 41 Pac. 291], decided in 1895. In that case certain pueblo lands of the City had been included within the limits of the defendant irrigation district. The district made an assessment on all lands in the district including the pueblo lands in question. Upon failure of the City to pay the assessment on these pueblo lands, they were sold to the district whereupon the City brought action to quiet its title in the land. The Supreme Court, referring to the provisions of the 1889 charter which empowered the City to sell or lease such of its land as had not been dedicated or reserved to public use and stating that the lands then being considered were among those which could be sold by the City, held them subject to the irrigation district tax and refused to quiet the City's title.

The third and most recent case is *San Diego* v. *Cuyamaca Water Co.*, 209 Cal. 105 [287 Pac. 475], decided in 1930. There the rights of the former pueblo, now City, of San Diego in the water of the San Diego River were under consideration and it was held that the rights of the City in this water could not be lost by adverse possession but in

commenting on *Ames* v. *San Diego, supra,* the court at page 493, of 287 Pac., points out clearly the distinction between pueblo lands held by the City of San Diego in trust for a specific public use and pueblo lands which might be alienated by the City showing that the former could not, while the latter could, be taken from the City by adverse possession.

Defendant City of San Diego contends that the decision in *Ames* v. *San Diego, supra,* did not deal with pueblo lands in the sense that that term is used in the case at bar but merely dealt with a *solare* or house lot which had theretofore been set aside by the pueblo for the private ownership of the then plaintiff, the legal title thus being held by the City of San Diego in trust for the then plaintiff. Defendant argues that if the language used in the Ames case should be held to apply to pueblo lands such as we are now considering the Ames decision is incorrect since it violates the fundamentals of the Spanish and Mexican law with reference to pueblo lands. We have carefully considered defendant's attempt to differentiate the decision in the Ames case but are constrained to hold it to be without merit.

Counsel for defendant makes the additional point that the 1909 amendment to the Freeholders' Charter prohibiting the sale of the pueblo lands until 1930 would be nullified were squatters allowed to acquire the land simply by going on it and staying there. A somewhat similar contention was made in *People* v. *Banning Co.*, 167 Cal. 643, 647, 648 [140 Pac. 587], and it was there held that the land was subject to adverse possession nevertheless.

We hold therefore that, even though the lands in question be pueblo lands of the City of San Diego, nevertheless the fact that they have not been reserved for or dedicated to a specific public use and are subject to alienation by the City renders them, under the decisions heretofore cited, subject to the law of adverse possession.

The judgment is affirmed.

Barnard, J., and Marks, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on December 12, 1930, and a

560

petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on January 12, 1931.