[Civ. No. 443.   Fifth Dist.   Dec. 15, 1965.]

MUSHROOM TUNNEL FARMS, INC., Plaintiff and Respondent, v. ADOLF FRIEDEBERG, Defendant and Appellant.

Kane & Canelo and Thomas J. Kane, Jr., for Defendant and Appellant.

C. Ray Robinson and Mary C. Fisher for Plaintiff and Respondent.

STONE, J.—Defendant appeals from an adverse judgment entered by the court sitting without a jury, in an action to quiet title to three railroad bridges.

Between 1900 and about 1945 the Yosemite Valley Railroad owned and operated an 80-mile railway between Merced and El Portal in Mariposa County.  In the late 1920's the construction of Exchequer Dam necessitated relocation of the

railroad right of way and building of certain tunnels, trestles and bridges on the railroad's fee, including the three bridges with which we are concerned.

Thereafter defendant Adolf Friedeberg, Al Perlman and others formed a partnership for the purpose of obtaining the majority of Yosemite Valley Railroad first mortgage bonds. The railroad ceased operations and defaulted on the bonds in 1945, whereupon the Adolf Friedeberg group demanded that the trustee of the railroad sell the assets.

A foreclosure sale was held September 7, 1945, and through Perlman the Adolf Friedeberg group purchased all the assets for $585,000. The "Trustee's Deed and Bill of Sale" purported to convey all real and personal property owned by the railroad, including by description but not limited to, the real property in fee, franchises, and "all roadbeds, superstructures, rights of way, . . . , bridges, viaducts, culverts, embankments, lands, yards, . . . , buildings, offices, depots, depot grounds, stations, . . . , fences, . . . , erections and fixtures. . . ." A chattel mortgage and trust deed on the property was executed on the same day by the Adolf Friedeberg group, through Perlman, to the Bank of America, to secure a loan of $650,000 used to buy the assets. The deed of trust described all the real property purchased and specifically mentioned the bridges. The chattel mortgage described numerous items of personal property, including locomotives, equipment, machinery and miscellaneous, and 80 miles of track, but made no mention of bridges.

Between September 7, 1945, and July 23, 1946, the Adolf Friedeberg group sold the rails, some of the locomotives and other equipment, and with the proceeds paid off the chattel mortgage. On July 23, 1946, through Perlman, they quitclaimed the remaining railroad property to Benjamin Schwartz, a business friend of defendant. The quitclaim deed included the usual reference to "tenements, hereditaments and appurtenances thereunto belonging or in anywise appertaining," with no individual or general description of such "appurtenances." The record discloses no bill of sale accompanying the transaction.

On October 28, 1946, Schwartz appointed Fred Friedeberg, brother of defendant, as his general attorney.

Sometime before February 8, 1947, one Donald Kellogg, in conjunction with his father, C. C. Kellogg, and others, became interested in four tunnels on a 16-mile section of the right of way for a dark, cool environment to grow mush-

rooms. The 16-mile section contained seven bridges, of which four, not in controversy here, provided access to the tunnels. None of the three bridges the subject of this action was necessary for access.

Thereafter, on February 8, 1947, Schwartz, through Fred Friedeberg, deeded the 16-mile strip of land to Donald Kellogg. As in the deed from the Adolf Friedeberg group to Schwartz, the usual reference to "tenements, hereditaments and appurtenances" was used, with no general or individual description of the "appurtenances." Again, there is no record of a bill of sale from Schwartz to Donald Kellogg.

Sometime between February 8, 1947, and October 2, 1947, Schwartz threatened to sell all the bridges located on the 16-mile strip. C. C. Kellogg discussed this problem with his son, Donald Kellogg, and decided to purchase all seven of the bridges. Schwartz purported to convey them by a bill of sale for a purchase price of $3,000 cash and $16,500 in unsecured notes of C. C. Kellogg.

On October 14, 1947, Donald Kellogg deeded the 16-mile strip of land and appurtenances to plaintiff, and on the same day C. C. Kellogg gave plaintiff a bill of sale purporting to convey the four bridges not in controversy here, for $10. Plaintiff was thereafter incorporated on July 12, 1948. On July 24, 1948, Mrs. Ann Patterson, the shareholder bringing this action, entered into a stock purchase agreement which expressly recognized the three bridges involved here as being C. C. Kellogg's sole property. On October 11, 1948, in its application to issue stock, Mushroom Tunnel Farms expressly denied ownership of the three bridges involved here. The permit was issued but the stock was placed in escrow at Crocker Anglo National Bank in Merced, and there it remains. Plaintiff claims the bridges passed to it by the deed of October 14, 1947, from Donald Kellogg.

Fred Friedeberg discounted C. C. Kellogg's unsecured notes given in purchase of the bridges, at the First National Bank in Merced. The Adolf Friedeberg group acquired the notes and upon default a suit was instituted, resulting in a judgment against C. C. Kellogg. To satisfy the judgment an execution issued on October 30, 1959, and at a sheriff's sale on November 10, 1959, one Lewis purchased C. C. Kellogg's interest in the three bridges for $5,000, and thereafter conveyed said interest to defendant. Thus defendant claims title through a sheriff's sale had pursuant to the judgment based on the unsecured notes.

The trial court found that title to the bridges was conveyed to Donald Kellogg by the Schwartz quitclaim deed to the 16-mile strip of real property, and that the subsequent purported transfer of the bridges to C. C. Kellogg by a bill of sale, was a nullity.

Defendant first contends the bridges were personal property as a matter of law. He relies upon the case of *County of Placer* v. *Lake Tahoe Ry. & Transp. Co.*, 58 Cal. App. 764 [209 P. 900], in which the question was whether railroad tracks and "a couple of cabins, a paint shop, a shed, a cottage, an engine house and a car barn" became affixed to and a part of the land upon which they were constructed. The court held they did not, using in part the following general language: "A railroad company is a public agency and an instrument of commerce and its tracks and the buildings necessary to carry on its purposes are mere accessories to the operation of its business." (P. 782.)

Although the opinion speaks of "tracks," it does not refer to the roadbed or bridges or trestles or other parts of the roadbed as such. It is arguable that tracks, buildings and similar improvements are more likely to be considered personal property that do not become affixed to land than are bridges set on concrete foundations. The case is distinguishable, however, upon the fundamental ground that the railroad company never intended to make the improvements a part of the land. As the court said, "the question whether personal property affixed to land becomes a part thereof is largely one of intention." The facts stated reflect that the railroad company knew it did not own the land, and that it claimed nothing more than a right of user pursuant to a resolution by the county board of supervisors which granted a franchise to cross over the land. It turned out the county had no authority to grant such a franchise or license, and the railroad company had no right at all to be on the land. Since the railroad company never presumed ownership of the land and never manifested an intent to make its personal property a part of land it did not own, general language in the *County of Placer* opinion appearing to hold that railroad property "cannot be held to become a part of the realty," is out of context if taken alone. It must be qualified by both the facts stated in the opinion and the basic holding of the case that the question whether appurtenances once fixed upon land become a part of the real property, is one of intent.

Perhaps the most persuasive argument that *County of Placer* v. *Lake Tahoe Ry. & Transp. Co., supra*, does not

stand for the abstract proposition that railroad improvements never attach to the land is found by researching one of the authorities relied upon by the court, a Kansas case, *St. Louis, K. & S. W. Ry. Co.* v. *Nyce,* 61 Kan. 394 [59 P. 1040, 48 L.R.A. 241]. A later Kansas Supreme Court case distinguishes *Nyce,* saying: ''It was a convenient, equitable, and highly necessary rule to apply to the unusual situation presented where the title to the realty of the right of way was in one owner and the railway improvements or fixtures belonged to another owner who had no valid claim to the realty. Otherwise an indispensable segment of a railway track would become the property of a successful claimant to a strip of real estate occupied by the railway, and the public convenience in railway travel might be interfered with. That was the potential situation in the Nyce Case. But where the dominant estate in the land over which the railway is constructed is in the same owner as the railway improvements or fixtures thereon, there is no occasion for the application of the 'trade fixtures' rule.'' (*Union Pac. R. Co.* v. *Board of Comrs.,* 114 Kan. 156 [217 P. 315, 317].)

In any event, cases applicable to railroads as a special class do not control in our case since defendant is not conducting a railroad business. The railroad company became insolvent and its assets were conveyed to Perlman, whose group bought the property not to operate a railroad for public convenience but for salvage. Schwartz took title from Perlman during the course of the salvage process. His conveyance to Donald Kellogg was but another and more remote step in the salvage process. Thus intent predicated upon public convenience is irrelevant as between Perlman and Schwartz, and between Schwartz and Donald Kellogg.

We turn now to the pertinent documents of conveyance, the first being the quitclaim deed from Perlman by which Schwartz took title. This deed makes no mention of bridges and the only conveyance or transfer of title to the bridges to Schwartz was through the habendum clause in the Perlman quitclaim deed. That clause reads as follows: ''Together with all and singular the tenements, hereditaments and appurtenances thereunto belonging or in anywise appertaining, and the reversion and reversions, remainder and remainders, rents, issues and profits thereof.''

The second deed of importance, the quitclaim from Schwartz to plaintiff's predecessor, Donald Kellogg, has a similar habendum clause.

A number of cases expressing the principles applicable in the interpretation of a deed are collected and summarized in *Palos Verdes Corp.* v. *Housing Authority,* 202 Cal.App.2d 827, at pages 835-836 [21 Cal.Rptr. 225], as follows: "The primary object of the interpretation of a deed is to ascertain and give effect to the intention of the parties, especially that of the grantor, as it existed at the time of the execution of the instrument. [Citation.]

"The intention of the parties to a grant is to be gathered, if possible, from the instrument itself and is determined by a proper construction of the language used, rather than by resorting to extrinsic evidence. [Citations.] If the language of a deed is plain, certain and unambiguous, neither parol evidence nor surrounding facts and circumstances will be considered to add to, detract from, or vary its terms or to determine the estate conveyed. [Citation.] In the absence of mistake, fraud, or other matter affecting the validity of the instrument, and except where collateral matters are involved, a deed executed in consummation of an agreement between the parties merges all prior negotiations and agreements relating thereto; and, with the exceptions noted, the deed becomes the measure of the rights of the parties."

The trial judge was justified in concluding that whatever Schwartz received by deed from Perlman, he conveyed by a like deed to Donald Kellogg.

Defendant's contention that evidence aliunde the deeds is controlling and that it does not support the finding of the trial court that Schwartz intended to convey the bridges as part of the real property, is untenable. The evidence upon which the trial judge relied is summarized in his memorandum opinion filed before findings were made. The memorandum states, in part:

"2. The bridges, in appearance and in fact, were as permanently affixed to and a part of the realty as the foundation of a ten story building. There was nothing to suggest the possibility of their removal, and the evidence is devoid of any suggestion of removal, or withholding by Schwartz.

"3. At the time of the transfers by Schwartz (through Friedeberg) to Donald Kellogg, of the 16 mile strip of land, and 'appurtenances', Schwartz knew that Kellogg represented and was acquiring the property on behalf of a group whose *sole* purpose in doing so was to grow mushrooms in the tunnels along the 16 mile strip of land, and to harvest and sell the mushrooms as a business venture. Schwartz and Donald Kellogg knew then that the tunnels, and most of the 16 mile

strip, were useless for Kellogg's and the group's sole purpose in acquiring the property unless access could be had to the tunnels. Both knew that such access was not realistically possible without certain of the bridges and trestles. Schwartz of necessity, knew that Donald Kellogg would not have made the purchase had there been any thought of excluding the bridges and trestles from sale and purchase—at least those bridges and trestles necessary for access to the tunnels.

"With this knowledge, Schwartz executed his deed to the land and 'appurtenances', making no written or oral reservation of any of the bridges or other former railroad property then owned by him."

In the light of the principles enunciated in the *Palos Verdes* case, the facts upon which the trial court based its findings are substantial and the deductions therefrom reasonable. Though defendant persuasively argues for a contrary interpretation, the sole question before us is whether substantial evidence supports the findings. We cannot reweigh the facts in the record; our review stops with our conclusion that the findings are supported by substantial evidence. In *Butler* v. *Butler*, 188 Cal.App.2d 228, at page 233 [10 Cal.Rptr. 382], the court said: "The matter of intention of the grantor is a question of fact to be determined by the trial court. If the inferences on which the court bases its findings are 'fairly and reasonably deducible from them, the finding must stand' [citation]. The court could properly presume from appellant's execution of a document which he admittedly read that he knew its legal effect."

We conclude that by quitclaim deed Schwartz conveyed title to the bridges to Donald Kellogg along with the real property to which the bridges were affixed, and that plaintiff acquired title thereto by deed from Donald Kellogg.

The judgment is affirmed.

Conley, P. J., and Brown (R. M.), J., concurred.