[No. A095725. First Dist., Div. One. May 22, 2002.]

WARREN ROBINSON et al., Plaintiffs and Appellants, v.
CHIN & HENSOLT et al., Defendants and Respondents.

**COUNSEL**

Law Offices of Laurence F. Padway and Laurence F. Padway for Plaintiffs and Appellants.

Gooding, Shinnick, Golub, Holt & Andersen and Douglas M. Gooding for Defendant and Respondent Homer J. Olsen, Inc.

Wulfsberg Reese & Sykes, H. James Wulfsberg, William L. Darby and David Darroch for Defendant and Respondent San Francisco Construction Management, Inc.

Severson & Werson, David E. Eriksen and Maureen E. McTague for Defendant and Respondent Chin & Hensolt.

Lewis, D'Amato, Brisbois & Bisgaard, Robert A. Ford and Stephen J. Gorog for Defendant and Respondent AMT Metal Fabricators, Inc.

Gordon & Rees, Richard Fike and David Collins for Defendant and Respondent Underground Railco.

---

**OPINION**

**MARCHIANO, P. J.**—This case involves San Francisco's "pretty cable cars, that climb halfway to the stars." But after they make that storied climb, they have to return. Several cable car lines use rotating turnarounds to change the direction of the cars. The issue before us is whether the three cable car turnarounds—at the intersections of Powell and Market, Beach and Hyde, and Bay and Taylor—are improvements to realty or personalty. We agree with the trial court that the turnarounds are not personal property but are improvements to real property for purposes of the statute of limitations in Code of Civil Procedure section 337.1.[1]

Appellants are 14 cable car operators. Respondents, defendants below, are the various contractors and subcontractors involved in the design and renovation of the cable car system between 1982 and 1984. In 1999, appellants sued respondents for personal injuries arising from respondents' alleged defective design and construction of the cable car turnarounds. Respondents moved for summary judgment on the ground that appellants' personal injury claims were based on patent design and construction defects in improvements to real property, and were thus time-barred by the four-year statute of limitations of section 337.1. The trial court granted respondents' motions and entered summary judgment. Appellants argue that section 337.1 does not apply because the cable car turnarounds are personal property, not improvements to real property. We disagree with appellants and affirm because the requirements of section 337.1 are satisfied.

## I.  FACTS

The facts of this case are not disputed. San Francisco's cable car system was entirely rebuilt between September 1982 and June 1984. (Callwell & Rice, Of Cables and Grips: The Cable Cars of San Francisco (2000), pp. 34-35 (hereafter Callwell & Rice).) The City and County of San Francisco (City) hired respondent San Francisco Construction Management, Inc., then known as O'Brien-Kreitzberg & Associates, Inc., as the construction manager for the cable car rehabilitation project. The City hired respondent Chin & Hensolt as the project's design consultant, and respondents Underground Railco, AMT Metal Fabricators, Inc., and Homer J. Olsen, Inc., as construction contractors for the rebuilding of the three turnarounds, known in cable car parlance as "turntables." (See Callwell & Rice, *supra,* at p. 42.)

---

[1] All further statutory citations are to the Code of Civil Procedure.

The cable car rehabilitation project was substantially completed in June 1984, when the cable car system resumed operation. Appellants, cable car operators employed by the San Francisco Municipal Railway (Muni), claim the new turntables were defectively designed and built in such a way that they were unacceptably difficult to rotate.

Specifically, appellants claim the turntables at Powell and Market and at Beach and Hyde turn on roller bearings of an inappropriate shape—cylindrical rather than tapered. Also, the turntable latch does not lock in the open position, requiring one of a cable car's two operators to hold the latch open. This effectively prevents that operator from helping with turntable rotation, leaving the other operator to perform the bulk of the work of manually rotating the turntable.[2]

Appellants claim the Bay and Taylor turntable suffers from the same problem with the latch that essentially requires one operator to manually rotate the turntable without assistance. Appellants further claim the Bay and Taylor turntable expands and contracts with heat and cold; is sensitive to impact due to the design of the center pedestal; and the center pedestal bearing is too small for its load and cannot be inspected.

Appellants allege these design and construction defects caused them personal injuries, apparently in large part due to the latch problem requiring one operator to shoulder the physical burden of turntable rotation. Their first complaint against respondents was filed June 10, 1999.

But the way in which the turntable latches operate, requiring one operator to hold the latch open while the other rotates the turntable, is both apparent to reasonable inspection and has been known to appellants and to Muni maintenance workers since the cable car system resumed operation in 1984. The other defects alleged by appellants are also apparent to reasonable inspection and have also been known to appellants or to Muni since 1984. Indeed, cable car operators have complained about the turntables being hard to turn since the 1984 resumption of cable car operations.

All five respondents filed separate motions for summary judgment, accompanied by separate statements of the material facts set forth above and supporting evidence. Respondents argued that the cable car turntables were improvements to real property within the meaning of section 337.1, the

---

[2] A turntable is essentially a large metal disc, onto which a cable car is pushed. The turntable is then rotated by hand so the cable car faces in the opposite direction. More information on the operation of a turntable can be found at <http://www.geocities.com/CapeCanaveral/Launchpad/3518/html/cchow.html> (as of May 22, 2002).

alleged defects were patent since 1984, and thus appellants' 1999 lawsuit was time-barred by the statute.

In opposition to the motions, appellants did not dispute the facts set forth in respondents' separate statements. Instead, appellants' separate statement set forth historical facts of the San Francisco cable car system, dating from its inception in 1873. Appellants' legal argument, based in part on this history, was that the cable car turntables were personal property, not improvements to real property, rendering section 337.1 inapplicable to appellants' lawsuit.

The trial court disagreed with appellants, found section 337.1 to apply to this case, and granted respondents' motions for summary judgment.

Because appellants rely on the history of the San Francisco cable car system, we briefly discuss that history to understand the use of turnarounds. We rely on sources filed with the trial court by appellants, as well as other sources of common knowledge in San Francisco and not reasonably subject to dispute.[3]

The San Francisco cable car system came into being in 1873, the brainchild of Andrew Smith Hallidie, a British-born San Francisco inventor and manufacturer of wire rope. (Callwell & Rice, *supra,* at pp. 4-6; The Transportation Technical Committee of the Departments of Public Works, Public Utilities, Police, and City Planning, History of Public Transit in San Francisco 1850-1948 (1948) p. 13 (hereafter History of Public Transit); Rowsome, Trolley Car Treasury: A Century of American Streetcars—Horsecars, Cable Cars, Interurbans, and Trolleys (1956) pp. 50-51 (hereafter Rowsome).)

While mines had already used cables to draw ore cars, Andrew Hallidie adapted the cable car concept to the carrying of urban passengers. (Rowsome, *supra,* at pp. 50-51.)[4] Hallidie's vision sprang in part from the inability of the existing horse-drawn passenger cars to fulfill the need for the City's expansion: "The steep grades which the rectangular street pattern imposed upon San Francisco proved utterly impossible of negotiation by the horse car. Consequently, the summits of the city's many downtown hills

---

[3]See Evidence Code section 452, subdivision (g). We do not attempt to present a complete history of the San Francisco cable car system. Interested readers seeking more information should refer to the sources cited in our opinion, or log on to <http://www.cablecarmuseum.com> (as of May 22, 2002).

[4]Apparently Hallidie was not the first to attempt the adapting of cable cars to mass transit—but he was the first to succeed. (Callwell & Rice, *supra,* at p. 6; see Rowsome, *supra,* at pp. 50-51.)

were but dreary waste areas. Only the very wealthy could reside upon the hill tops, and some means of effectively surmounting with mass transit vehicles the many hills was a vital necessity for the future expansion of the city." (History of Public Transit, *supra,* at p. 13.)

Hallidie not only created the first successful cable car mass transit system, but in the process "lick[ed] many design problems, including that of a workable cable grip." (Rowsome, *supra,* at p. 51.) Hallidie's system was based on an underground cable powered by a stationary steam engine; as the cable moved along, the unpowered cable car attached itself to the cable, through a slot in the road, by means of a cable grip which functioned like an oversized pair of pliers. This allowed the car to be pulled along by the cable, and to be pulled up the steep hills of San Francisco. Thus, the operator of the car who uses the cable grip device became known as the "gripman"—and eventually, "grip person." The second operator of a cable car is known as the conductor. (Callwell & Rice, *supra,* at pp. 6, 41-42; Rowsome, *supra,* at pp. 53-54; History of Public Transit, *supra,* at p. 13.)[5]

Hallidie's cable car system began public service on September 1, 1873, with the Clay Street line. The line, known as the Clay Street Hill Railroad, was "immediately popular" and successful, and was soon earning profits of an average of $3,000 a month. (Callwell & Rice, *supra,* at pp. 6-7; Rowsome, *supra,* at p. 53; History of Public Transit, *supra,* at p. 13.) Seven other cable car companies sprang up, starting with the Sutter Street Railroad in 1877. (Callwell & Rice, *supra,* at p. 8.) Other companies included the California Street Cable Railroad Company, or "Cal Cable," started by Leland Stanford, and the largest system, the Market Street Cable Railway, which was controlled by the Southern Pacific Railroad. (Callwell & Rice, *supra,* at pp. 10-11; History of Public Transit, *supra,* at pp. 14-16.)

As it is today, the lure of the cable car was powerful. "The first glimpse of a cable car was startling, even spooky, to a man familiar only with horsecars. Although there was nothing out in front to pull it, the car glided quietly past as if it were a magic carpet. It moved at a brisk 8 or 9 miles an hour, too, faster than horsecars had gone on all but a team's last run of the day, when the shrewd beasts knew they were headed for the stable and feedbags. It made very little noise, moving without the *clop-clop* that for decades had signaled the approach of a streetcar. . . . Riding on this newest marvel was as remarkable as watching it go by. The clean new car had none of the old

[5]The president of a Chicago cable car system once remarked, "A cable car has no will of its own to thwart the will and efforts of its faithful driver." (Rowsome, *supra,* at p. 49.)

More information on how cable cars work can be found at <http://www.cable-carmuseum.com/Anat/Anat.html> (as of May 22, 2002).

sweat-and-stable smell. A fellow stood in the middle and worked several long levers extending down through the floor; when he moved one of them the car instantly started up and in no time was rolling along at full speed. All you could hear was the rumble of the wheels, the click of the rail joints, and the occasional clang of the warning gong. The car seemed to go almost uneasily fast, especially around curves, . . .

"Much of the appeal of cable cars lay in their inherent simplicity. The principles were ones that anyone could grasp. A stationary steam engine drew an endless cable beneath the street, and a mechanism under the car could seize or release the cable at the 'gripman's' direction. It was a concept ideally suited to the engineering spirit of the [1870's]—an enthusiastic belief that cast iron and ingenuity could work almost any miracle." (Rowsome, *supra,* at p. 49.)

With the coming of the automobile and the bus, cable car ridership declined and most of the private cable companies went out of business. Eventually, in September 1944 the City took over the Market Street Railway and its Powell Street cable lines. By this time the only remaining private company was Cal Cable. (Callwell & Rice, *supra,* at pp. 20-21.)

Cal Cable closed down in 1951, leaving the City as the sole operator of San Francisco cable cars. The City bought and reopened the Cal Cable lines. There remained many opponents of cable cars, who focused on the cars' purported lack of profitability and overlooked their service to the public. (Callwell & Rice, *supra,* at pp. 28-29.) In addition, the cable car system was physically deteriorating. Beginning in 1954, several lines were eliminated from the system and the remainder were consolidated and repaired. (Callwell & Rice, *supra,* at pp. 30-31.) But the repair work "did not involve a complete rebuilding of the track and cable system." (*Id.* at p. 31.) The system, with turntables, remained intact.

By the late 1970's, however, the system had again deteriorated: "time and constant use were overcoming maintenance efforts." (Callwell & Rice, *supra,* at p. 33.) The City decided to completely rebuild the entire system, including the track, cable channels, turntables, and the cable car barn and powerhouse. (*Id.* at pp. 34-36.) "San Francisco had become a city whose economic base was becoming ever more dependent upon tourist dollars, and the unique cable car system of Andrew Smith Hallidie was universally recognized as a major asset in attracting tourists." (*Id.* at p. 33.)

The cable car system was shut down in September 1982, completely rebuilt, and reopened in June 1984. (Callwell & Rice, *supra,* at pp. 34-39.) It

is now powered by electric engines located in the power house at Washington and Mason Streets. Each cable car continues to use two operators, a grip person and a conductor, who—as they did in the early days of the cable cars—communicate with each other by ringing a small bell called the conductors' bell in a series of codes. The Powell/Mason and the Powell/Hyde lines use single-ended cars that can operate in only one direction. They require turntables at the end of the lines to reverse directions. With this background regarding the system including its turntables, we turn to appellants' arguments.

## II. DISCUSSION

Appellants argue that the four-year limitations period of section 337.1 does not bar their lawsuit against respondents because the cable car turntables are personal property, not real property. We disagree because the turntables are an improvement to real property.

Section 337.1 provides, as here pertinent, that "no action shall be brought to recover damages from any person performing or furnishing the design, specifications, surveying, planning, supervision or observation of construction or construction of an improvement to real property more than four years after the substantial completion of such improvement" for "[a]ny patent deficiency in the design, specifications, surveying, planning, supervision or observation of construction or construction of an improvement to, or survey of, real property."[6]

Appellants do not rely on any of the decisions interpreting section 337.1. Instead, appellants rely solely on a 1922 decision which involved an intrastate railroad—not a municipal railway's cable car system—decided 45 years before section 337.1 was enacted in 1967. (Stats 1967, ch. 1326, § 1, pp. 3157-3158.) Appellants place all their appellate eggs in the basket of *County of Placer v. Lake Tahoe Ry. Co.* (1922) 58 Cal.App. 764 (*County of Placer*).

*County of Placer* involved a dispute over a block of land in Tahoe City, California, which the plaintiff county alleged was public commons. The defendants, a railway company and associated entities, claimed ownership of the land and had been operating a steam railroad across the property as part of passenger and freight service connecting Tahoe City and Truckee. (*County of Placer, supra,* 58 Cal.App. at pp. 765-767.) In addition to railroad

---

[6]The phrases "patent deficiency" and "patent defect" are synonymous. (See *Roger E. Smith, Inc. v. SHN Consulting Engineers & Geologists, Inc.* (2001) 89 Cal.App.4th 638, 644 [107 Cal.Rptr.2d 424] (*Smith*).)

tracks and switches, the defendants maintained on the block of land a group of structures "consist[ing] of a couple of cabins, a paint-shop, a shed, a cottage, an engine-house, and a car-barn." (*Id.* at pp. 766, 781-782.) The tracks, switches and structures "were erected and used as essential equipments of [defendant Tahoe] Railway Company 'plant,' so to speak, or used in aid of the operation of the business of said defendant as a transportation company." (*Id.* at pp. 781-782.)

For reasons we need not discuss, the trial court in *County of Placer* upheld the county's claim of ownership of the block of land. The trial court decreed that the Tahoe Railway Company had no ownership interest in the land, and was required to—in effect had the right to—remove its tracks and structures. (*County of Placer, supra,* 58 Cal.App. at pp. 767-768, 783-784.)

On appeal, the *County of Placer* court affirmed the decree, except in one instance not relevant here. (*County of Placer, supra,* 58 Cal.App. at pp. 783-784.) The county argued on appeal that the tracks and structures had supposedly become "a part of the realty," and that the trial court had erred by allowing the Tahoe Railway Company to remove its tracks and structures from the land. The *County of Placer* court rejected that argument. (*Id.* at pp. 781-782.)

After noting the tracks and structures had been placed upon the land for the purpose of operating a railway, the *County of Placer* court declined "to enter into a general or an exhaustive discussion of the principles underlying the law of fixtures or to undertake to distinguish the occasions on which personal property annexed to real property becomes a part of the latter from those on which such property when so annexed retains its original identity." (*County of Placer, supra,* 58 Cal.App. at p. 782.) The court felt it sufficient to invoke the general rule that whether personal property becomes a fixture to real property is a question of intent. (*Ibid.*)

The *County of Placer* court emphasized that the Tahoe Railway Company had placed the tracks and related structures on the land for the purpose of operating a railroad. (*County of Placer, supra,* 58 Cal.App. at p. 782.) The court reasoned: "A railroad company is a public agency and an instrument of commerce and its tracks and the buildings necessary to carry on its purposes are mere accessories to the operation of its business." Because the requirements of conducting that business, or perhaps even public necessity, might require a railroad to "abandon a certain right of way and remove its tracks and equipments to another," the court believed it was "only responsive to sound reason to say that where a railway company lays its tracks and erects buildings for the proper conduct of its transportation business over and

across land under a claim of right, such property cannot be held to become a part of the realty, but will at all times retain the character of personalty." (*Ibid.*)

In support of this view, the *County of Placer* court cited five railroad decisions from four states, Kansas, Ohio, Illinois, and New York, including *St. Louis, K. & S. W. R. Co. v. Nyce* (1900) 61 Kan. 394 [59 P. 1040] (*Nyce*). (*County of Placer, supra,* 58 Cal.App. at pp. 782-783.) *Nyce* applied the so-called "trade fixtures rule," and held that improvements placed upon land by a railway company—such as tracks and ties—were improvements for the purpose of conducting the trade and business of a railway company and thus remained the personal property of the railroad. (See *Nyce, supra,* at pp. 1042-1045, 1047.)

Appellants contend that *County of Placer* stands for the proposition that "railway tracks and accessory structures do not become part of the underlying realty, but remain personalty at all times." But *County of Placer* does not stand for that proposition. Appellants oversimplify the issue.

In *Mushroom Tunnel Farms, Inc. v. Friedeberg* (1965) 238 Cal.App.2d 727 [48 Cal.Rptr. 317] (*Mushroom Tunnel Farms*), an action to quiet title to three railroad bridges, the court rejected an argument that *County of Placer* stood for a rule that "railroad improvements never attach to the land . . . ." (238 Cal.App.2d at pp. 730-731.) The *Mushroom Tunnel Farms* court[7] noted that such a rule would ignore the underlying question of intent in the law of fixtures. (*Id.* at p. 730.) The court also found it significant that the *Nyce* decision on which *County of Placer* relied was materially qualified by the very court that rendered it. (*Id.* at pp. 730-731.)

In *Union Pac. R. Co. v. Board of Com'rs.* (1923) 114 Kan. 156 [217 P. 315] (*Union Pacific*)—interestingly, decided only one year after *County of Placer*—the Supreme Court of Kansas held that the trade fixtures rule invoked by *Nyce* only applied when different entities owned the railroad tracks and the underlying land. The trade fixtures rule "was a convenient, equitable, and highly necessary rule to apply to the unusual situation presented where the title to the realty of the right of way was in one owner and the railway improvements or fixtures belonged to another owner who had no valid claim to the realty. Otherwise an indispensable segment of a railway track would become the property of a successful claimant to a strip of real estate occupied by the railway, and the public convenience in railway travel

---

[7]The case is so named because a corporation purchased portions of the defunct Yosemite Valley Railroad believing the abandoned tunnels would provide "a dark, cool environment to grow mushrooms." (*Mushroom Tunnel Farms, supra,* 238 Cal.App.2d at pp. 727-729.)

might be interfered with. That was the potential situation in the Nyce [c]ase. But where the dominant estate in the land over which the railway is constructed is in the same owner as the railway improvements or fixtures thereon, there is no occasion for the application of the 'trade fixtures' rule." (*Union Pacific, supra,* at p. 317.)

The court in *Mushroom Tunnel Farms* quoted this language with approval in rejecting the argument that *County of Placer* held that railroad tracks were always personalty—the same argument appellants now repeat. (*Mushroom Tunnel Farms, supra,* 238 Cal.App.2d at pp. 730-731.) We agree with *Mushroom Tunnel Farms* and reject appellants' contention that by virtue of *County of Placer* the turntables are, and will always be, personal property. We note that under the definitive interpretation of the Kansas Supreme Court in *Union Pacific,* this would not be a *Nyce* case. There can be no dispute that the City owns both the turntables (and the rest of the cable car system) as well as the real property on which the turntables lie—three intersections of City's streets.

Not only is appellants' reliance on *County of Placer* misplaced, but the cases construing section 337.1 require a ruling in favor of respondents.

■ Section 337.1 and its companion statute involving latent defects, section 337.15, "protect certain groups from indefinite liability." (*Nichols v. Swimquip* (1985) 171 Cal.App.3d 216, 220 [217 Cal.Rptr. 272] (*Nichols*).) The Legislature enacted section 337.1 in 1967 "in response to the construction industry's fear that it could face virtually unending liability due to the advent of discovery-based accrual rules for statutes of limitation. [Citations.]" (*Smith, supra,* 89 Cal.App.4th at pp. 646-647; see Boyle & Hastings, *California Code of Civil Procedure Sections 337.1 and 337.15: Defective Construction Defect Statutes* (1990) 21 Pacific L.J. 235, 243-246, 264-265.) Section 337.1 provides the "*outer limit* of when one of its protected class may be sued for a patent defect: no later than four years after substantial completion of the project." (*Smith, supra,* at p. 647, italics in original.)

Thus, section 337.1 was intended "to protect construction contractors from extended liability" (*Nichols, supra,* 171 Cal.App.3d at p. 220; see *Tomko Woll Group Architects, Inc. v. Superior Court* (1996) 46 Cal.App.4th 1326, 1333 [54 Cal.Rptr.2d 300]) and frees them from "the specter of lawsuits in the distant future." (*Wagner v. State of California* (1978) 86 Cal.App.3d 922, 929 [150 Cal.Rptr. 489].)

Whether or not section 337.1 applies depends on whether the defendant is a member of the classes of construction contractors designated in the statute.

Several cases hold that simply because a defective item is ultimately installed in an improvement to real property, the manufacturer of that item is not automatically entitled to protection from extended liability. "[T]he physical attachment of an item to real property does not determine the applicability of the [statute] . . . . Rather, the test is whether the defendant is in the class of persons the Legislature intended to protect . . . ." (*Nichols, supra,* 171 Cal.App.3d at p. 221.)

Thus, section 337.1 does not protect the manufacturer of a large pan installed in a sugar refinery to boil syrup during the sugar refinement process. (*Sevilla v. Stearns-Roger, Inc.* (1980) 101 Cal.App.3d 608, 609, 611 [161 Cal.Rptr. 700].) Neither does it protect the manufacturer of defective heating and air conditioning units ultimately installed in an office building. (*Baker v. Walker & Walker, Inc.* (1982) 133 Cal.App.3d 746, 750-751, 756-758 [184 Cal.Rptr. 245].) Nor does the statute protect the manufacturer of a defective diving platform installed in a swimming pool. (*Nichols, supra,* 171 Cal.App.3d at pp. 218, 220-222.) A common thread of these decisions is the total absence of any legislative intent to protect mere manufacturers of devices solely because they happened to be installed in real property.

Perhaps because of these decisions holding mere manufacturers outside the pale of section 337.1, appellants suggest that by constructing the turntables appellants simply built machine-like devices, which are personal property and not part of the realty. But the design and construction of the turntables, at three intersections of City streets, unquestionably constituted an improvement to real property. Turntables, used for many decades, are an integral and indispensable improvement, adding value to the City in the same way that affixed park benches or city-provided street escalators enhance the City's real estate. Simply because a mechanical turnaround can be torn out does not make it any less of an improvement to San Francisco's real property.

The construction contracts provided for the design and installation of turnarounds which were installed in a system that occupies selected streets of San Francisco.

The test for applicability of section 337.1 is whether the defendants belong to the classes of construction contractors protected by the statute. There is no dispute that respondents, as construction managers, designers, and contractors, are not mere manufacturers but fall within the classes intended to be protected by the statute. (See *Nichols, supra,* 171 Cal.App.3d at pp. 220-221.) Their work on the cable car system involved an improvement to the real property of the City and county. There is no dispute that the alleged defects in the turntables were patent. There is no dispute the alleged

defects were known to appellants and Muni in 1984, and that appellants did not file suit against respondents until 15 years later, in 1999. Thus, section 337.1 bars appellants' lawsuit.

We ring the conductor's bell three times for the signal to bring this case to a stop—hopefully, in the best San Francisco cable car tradition, a smooth one.[8]

### III. DISPOSITION

The summary judgments in respondents' favor are affirmed.

Stein, J., and Margulies, J., concurred.

A petition for a rehearing was denied June 21, 2002, and the opinion was modified to read as printed above. Appellants' petition for review by the Supreme Court was denied August 14, 2002.

---

[8]The bell codes are found at <http://www.cablecarmuseum.com/Anat/Anat.html> (as of May 22, 2002). Three clanging bells is the signal for a running cable car to "stop immediately, but smoothly."